

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 2 7 2014

Madsen, C. J.
CHIEF JUSTICE



This opinion was filed for record
at 8:00 am on Feb. 27, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

PT AIR WATCHERS; NO
BIOMASS BURN; WORLD
TEMPERATE RAINFOREST
NETWORK; OLYMPIC
ENVIRONMENTAL COUNCIL;
and OLYMPIC FOREST
COALITION,

Appellants,

v.

STATE OF WASHINGTON,
DEPARTMENT OF ECOLOGY;
and PORT TOWNSEND PAPER
CORPORATION,

Respondents.

No. 88208-8
En Banc

Filed FEB 2 7 2014

J.M. JOHNSON, J.— In this case, we are asked to consider whether the Department of Ecology (Ecology), in determining that no environmental impact statement (EIS) was necessary for a proposed energy cogeneration

project, failed to adequately consider the effects of carbon dioxide emissions and demand for woody biomass from the state's forests. We are also asked to consider whether the project is exempt from the EIS requirement as part of an energy recovery facility that existed before January 1, 1989. Ecology adequately reviewed the relevant information in determining that the project would not have significant impacts on the environment, and the project is exempt from the EIS requirement as part of an energy recovery facility that existed before January 1, 1989. We affirm the Pollution Control Hearings Board (Board).

FACTS AND PROCEDURAL HISTORY

Respondent Port Townsend Paper Corporation (PTPC) owns and operates a kraft pulp and paper mill in Port Townsend, WA. The mill burns fossil fuel and woody biomass[1] to produce steam for use in its pulp and paper-making processes. In May 2010, PTPC applied to Ecology for a notice of construction (NOC) permit allowing it to construct a new cogeneration project

---

[1] "Biomass" includes "residual branches, needles, and tree tops (slash) left over from ongoing logging operations; products of pre-commercial thinning (small saplings from overcrowded young forests); tree stems and tops thinned from forests that are at risk from wildfires, insects or diseases (forest health treatments) that are not currently utilized; clean, untreated wood construction and demolition waste (that would otherwise have gone to the landfill); and unused materials from lumber mills, such as sawdust, shavings, chips or bark." Administrative Record at 414.

at the existing mill. The project at issue will minimize the burning of fossil fuel, increase the burning of woody biomass, and add an electrical turbine to one of its steam boilers. The project will increase the firing efficiency in the mill's power boiler 10 (PB10) in order to burn primarily woody biomass to produce the increased steam for a new steam turbine. The project will add up to 25 megawatts of electrical generating capacity to the mill, which will sell some of this electricity to the power distribution system. Increased firing in PB10 will result in increased emissions of some pollutants, including carbon dioxide. Administrative Record (AR) at 260.

Ecology reviewed PTPC's NOC application under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. On September 24, 2010, Ecology issued a determination of nonsignificance (DNS) and opened a public comment period until October 8, 2010. AR at 496. On October 22, 2010, Ecology issued NOC Order No. 7850, approving construction of the project. AR at 497.

PT Air Watchers and a number of other environmental groups (collectively PT Air Watchers) timely appealed the NOC and underlying SEPA DNS to the Board. The appeal focused on whether Ecology erred in failing to consider the environmental impacts from the increased carbon

dioxide emissions resulting from burning woody biomass in order to generate energy. The appeal also concerned the environmental impacts on Northwest forests that may result from the increased demand for woody biomass needed to generate the energy. Finally, PT Air Watchers challenged Ecology's failure to require preparation of an EIS.

All parties filed motions for summary judgment. On May 10, 2011, the Board issued an order granting summary judgment to PTPC and Ecology on the primary issues in the underlying appeal. AR at 1516-41. PT Air Watchers then filed a timely petition for review under the Administrative Procedure Act (APA), chapter 34.05 RCW, to the Thurston County Superior Court on three SEPA-related issues. On April 10, 2012, the superior court denied PT Air Watchers' petition for review, upholding the Board's order granting summary judgment. PT Air Watchers then appealed to Division Two of the Court of Appeals, which certified the matter to this court pursuant to RCW 2.06.030. Certification was accepted on December 31, 2012.

## ISSUES

1. Did Ecology and the Board correctly consider the legislative policy behind RCW 70.235.020(3) in concluding that greenhouse gas emissions from the project would not have significant environmental impacts?

2.     Did Ecology and the Board correctly conclude that the project would not result in adverse impacts to forest resources?

3.     Did Ecology and the Board correctly conclude that an EIS is not required under RCW 70.95.700?

STANDARD OF REVIEW

1.     <u>APA Standard of Review</u>

The APA governs judicial review of the Board's decision. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). Under the APA, "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). "We accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998); *see also Port of Seattle*, 151 Wn.2d at 587 ("[I]f an ambiguous statute falls within the agency's expertise, the agency's interpretation of the statute is 'accorded great weight, provided it does not conflict with the statute.'" (quoting *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002))). The Board's order should be upheld unless we find that

the Board erroneously interpreted or applied the law, or the Board's order is not supported by substantial evidence. RCW 34.05.570(3)(d), (e).

2.      SEPA Standard of Review

SEPA establishes a process for evaluating the reasonably foreseeable environmental consequences of proposed projects. Here, we are considering Ecology's threshold determination that the project will not have significant impacts and that an EIS is not required. This determination is based on an environmental checklist (checklist) prepared by the project applicant. WAC 197-11-315, -330 ("An EIS is required for proposals for legislation and other major actions significantly affecting the quality of the environment."). If the checklist reveals that a project will not have significant impacts, Ecology issues a DNS and the environmental review is over, allowing the project to proceed. WAC 197-11-340.

Ecology's threshold SEPA determinations are entitled to substantial weight. RCW 43.21C.090; *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 275, 552 P.2d 674 (1976) (recognizing that the "clearly erroneous" standard of review is appropriate in this context). We must affirm unless we are "'left with the definite and firm conviction that a mistake has been committed.'" *Ancheta v. Daly*, 77 Wn.2d 255, 259-60, 461

P.2d 531 (1969) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)).

ANALYSIS

1.  <u>Ecology and the Board Correctly Considered the Legislative Policy behind RCW 70.235.020(3) to Conclude that Greenhouse Gas Emissions from the Project Would Not Have Significant Environmental Impacts</u>

As the first step in a SEPA analysis, the SEPA lead agency must make a threshold determination concerning whether an EIS is required. WAC 197-11-310(1), -797. If the agency determines that the probable effect of the action is significant, the agency issues a determination of significance (DS) and requires an EIS. WAC 197-11-360(1); RCW 43.21C.030(c) (SEPA requirement of preparation of an EIS for all "major actions significantly affecting the quality of the environment."). If the agency determines that the probable effect of the action is not significant, the agency issues a DNS and an EIS is not required. WAC 197-11-340(1). "The SEPA policies of full disclosure and consideration of environmental values require actual consideration of environmental factors before a determination of no environmental significance can be made." *Norway Hill*, 87 Wn.2d at 275. Furthermore, a DNS must be "based upon information reasonably sufficient to evaluate the environmental impact of a proposal." *Moss v. City of*

*Bellingham*, 109 Wn. App. 6, 14, 31 P.3d 703 (2001).

PT Air Watchers claims that the DNS was improper because the release of greenhouse gases, including carbon dioxide, can have a significant impact on the human and built environment. Ecology concedes that increasing the amounts of carbon dioxide in the atmosphere would have an adverse effect on the environment. Resp't Dep't of Ecology's Resp. Br. at 10. Ecology, however, argues that PT Air Watchers' concern is misplaced because the project will actually decrease the amount of carbon dioxide in the atmosphere.

The purported decrease in carbon dioxide results from the decreased amount of fossil fuel PTPC will burn as a result of the project. PTPC will burn 1.8 million fewer gallons of fossil fuel per year. AR at 397. The respondents acknowledge that the burning of biomass, like the burning of fossil fuel, emits carbon dioxide into the atmosphere. However, they contend that the burning of biomass does not add to the total amount of carbon dioxide in the atmosphere. Biomass is part of the earth's carbon cycle, where plants take in carbon dioxide from the atmosphere and then release it when they decay or die. AR at 408. Biomass naturally releases this carbon dioxide if left on the forest floor to decompose. Forest fires and slash burning also release the carbon dioxide stored in biomass. In contrast, fossil fuels are not

part of the earth's carbon cycle. AR at 272. Fossil fuels release carbon dioxide into the earth's atmosphere only when they are burned. *Id.* When fossil fuel is replaced by biomass fuel, the new carbon dioxide that would normally be emitted from fossil fuel is replaced by carbon dioxide that will be emitted into the atmosphere regardless of whether the biomass is burned. *Id.* The respondents contend that, in this way, the replacement of fossil fuel with biomass fuel decreases the total amount of carbon dioxide in the atmosphere. *Id.*

a.     Ecology's Consideration of RCW 70.235.020(3)

In support of this argument, Ecology and PTPC point to RCW 70.235.020(3), which provides, "Except for purposes of reporting, emissions of carbon dioxide from industrial combustion of biomass in the form of fuel wood, wood waste, wood by-products, and wood residuals shall not be considered a greenhouse gas as long as the region's silvicultural sequestration capacity is maintained or increased."[2] In implementing this legislation, it was the intent of the legislature that the state would "(a) [l]imit and reduce emissions of greenhouse gas . . . ; (b) minimize the potential to export

---

[2] "Silvicultural sequestration capacity" is the capacity of forest structures to store carbon dioxide. The record suggests that the Northwest's silvicultural sequestration capacity is currently being maintained or increasing.

pollution, jobs, and economic opportunities; and (c) reduce emissions at the lowest cost to Washington's economy, consumers, and businesses." RCW 70.235.005(3). Among other things, the statute lists concrete greenhouse gas emissions reduction goals and timelines. RCW 70.235.020(1).

Here, the checklist specifically invoked RCW 70.235.020, which demonstrates the legislature's preference for the burning of woody biomass over the burning of other fuels. The checklist also indicated that, as a result of the project, PTPC would decrease the amount of fossil fuels burned by 1.8 million gallons per year. AR at 397. Given this information, it was appropriate for Ecology to assume that the project will decrease the total amount of carbon dioxide in the environment from PB10. SEPA does not require a statement of the exact amount of carbon dioxide that would be released as a result of the project. Furthermore, courts afford deference to the agency's interpretation of law where the agency has specialized expertise in the field. *City of Redmond*, 136 Wn.2d at 46.

We note the legislative preference in RCW 70.235.020(3) is a legitimate reference point for a lead agency's consideration, *see* WAC 197-11-315(6), but cannot be read as determinative of any particular project's impact on the environment. First, whether an emission is classified as a

10

greenhouse gas depends on its impact on the climate, 42 U.S.C. § 7545(o)(1)(G), but "[c]limate" is only one of many elements of the environment to be considered, WAC 197-11-444(1)(b)(iii). Second, a lead agency has the authority under SEPA to reach independent, project-specific determinations, and that authority is not limited by RCW 70.235.020(3)—chapter 70.235 RCW specifically provides it does not limit any agency's preexisting authority unless it specifically purports to do so. RCW 70.235.020(1)(c), .900.

Had Ecology and the Board entirely ignored the impact of greenhouse gas emissions from woody biomass incineration, as PT Air Watchers asserts, we might reach a different result. However, the record demonstrates that this is not the case presented. The opportunity to present conflicting, project-specific, scientific information was amply provided. Ecology accepted public comments, AR at 33, which is a step not even required by statute. RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS §13.01[4], at 13-37 (2013) ("While neither written findings and conclusions nor public hearings are required, unless perhaps imposed by agency SEPA procedures, they frequently are volunteered and tend to enhance public and judicial respect for the threshold determination."

(footnotes omitted)). The Board considered a wealth of information in rendering its summary judgment decision. Clerk's Papers at 17-18 (listing, in the Board's summary judgment order, the extensive briefing and attachments considered). PT Air Watchers did not present sufficient conflicting information to create a genuine issue of material fact precluding summary judgment.

In this case, Ecology properly considered RCW 70.235.020(3) in performing its threshold SEPA analysis. We recognize Ecology's specialized expertise in this field and defer to this reasonable interpretation of the statute that is consistent with its plain language. We hold that Ecology and the Board properly considered the legislative policy behind RCW 70.235.020(3) in concluding that greenhouse gas emissions from the project would not have significant environmental impacts.

b. <u>Sufficiency of Checklist and DNS</u>

PT Air Watchers asserts that the checklist and DNS did not contain sufficient information for Ecology to evaluate the impacts from carbon dioxide emissions that will result from the project.

The checklist, however, properly addressed these issues, including emissions of greenhouse gases from the increased transportation of biomass.

PTPC provided an estimate for the additional truck routes needed to transport the biomass as well as an estimate of the required fuel. AR at 405, 557. The fact that PTPC did not provide specific carbon dioxide emissions estimates is irrelevant. The information provided was sufficient to evaluate the general change in greenhouse gas emissions. In sum, it was reasonable for Ecology to conclude that the additional fuel needed to transport the biomass would not have a significant impact on the environment.

SEPA does not require the reporting of specific emissions. Instead, the agencies must assess environmental impacts. RCW 43.21C.030(2)(c)(i); WAC 197-11-060, -330(1). Here, the assessment of environmental impacts was effectively carried out without listing specific estimates of emitted pollutants. Therefore, PTPC was not required to report estimates in its SEPA checklist. *See Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 312, 197 P.3d 1153 (2008) (holding that the final environmental impact statement in question "served its function of presenting 'decisionmakers with a reasonably thorough discussion' of the visual impacts of the project," even though it did not list a specific option as a potential mitigation measure (internal quotation marks omitted) (quoting *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122

Wn.2d 619, 633, 860 P.2d 390, 866 P.2d 1256 (1993))).

The record indicates that Ecology engaged in a reasoned assessment of the environmental impacts of the proposed project. Ecology's interpretation and consideration of RCW 70.235.020(3) was reasonable, and the checklist and DNS contained sufficient information to weigh the environmental impacts of the project. Accordingly, we hold that Ecology correctly concluded that greenhouse gas emissions from the project would not have significant environmental impacts.

2.   Ecology and the Board Correctly Concluded That the Project Would Not Result in Adverse Impacts to Forest Resources

PT Air Watchers claims that the SEPA checklist and the DNS were inadequate for failing to consider the impacts of removing biomass from Northwest forests. They contend that Ecology's analysis failed to explain the effects of increased competition for forest wood waste and how that could affect forest health.

In issuing the DNS, Ecology relied on the fact that the project would have to comply with other state and federal laws and regulations that ensure that the removal of biomass from forest lands does not adversely affect forest lands or endangered species. Washington's Forest Practices Act, ch. 76.09 RCW, includes the removal of biomass from forests as a regulated forest

practice. WAC 222-16-010 ("'**Forest practice**' means any activity conducted on or directly pertaining to forest land and relating to growing, harvesting, or processing timber, or removing forest biomass."). Washington also has a variety of regulations concerning the removal of biomass, including a permitting process. Permits are issued only if the applicant can demonstrate compliance with the forest practice rules designed to protect the ecosystem.

Finally, PT Air Watchers' argument that the project may lead to cutting trees solely for the purpose of providing fuel for the project fails to take into account that PTPC does not plan to harvest new wood. *See* AR at 365. An agency does not have to consider every conceivable environmental impact when making its threshold SEPA determination, and certainly not a potential impact that is not permitted by the NOC order.

Because PTPC does not plan to cut down new sources of wood for the project, Ecology did not need to consider the impact of such actions on Northwest forests. Ecology ultimately determined that the project would not have a significant impact on the environment, which should be accorded substantial weight. *See* RCW 43.21C.090. We hold that Ecology correctly concluded that the project would not result in adverse impacts to forest resources.

3.  Ecology and the Board Correctly Concluded That an EIS Is Not Required under RCW 70.95.700

In addition to their arguments regarding RCW 70.235.020(3), the sufficiency of the checklist and DNS, and the project's effect on forest resources, PT Air Watchers contends that an EIS is required pursuant to a separate statutory provision. RCW 70.95.700 provides, "No solid waste incineration or energy recovery facility shall be operated prior to the completion of an environmental impact statement . . . . This section does not apply to a facility operated prior to January 1, 1989, as a solid waste incineration facility or energy recovery facility burning solid waste." "Energy recovery" is defined as "a process operating under federal and state environmental laws and regulations for converting solid waste into usable energy and for reducing the volume of solid waste." RCW 70.95.030(7). "Solid waste" is defined as "all putrescible and nonputrescible solid and semisolid wastes including, but not limited to, garbage, rubbish, ashes, industrial wastes, swill, sewage sludge, demolition and construction wastes, abandoned vehicles or parts thereof, and recyclable materials." RCW 70.95.030(22).

Although Ecology does not classify wood fuels as solid waste, PB10 has been burning some solid wastes, including primary sludge, from the

process wastewater treatment plant for approximately 30 years. AR at 223, 240. Because PB10 is an energy recovery facility that burns at least one fuel classified as solid waste (sewage sludge), it is subject to RCW 70.95.700. An EIS is required unless PB10 falls under the exception to the statute for facilities operated prior to January 1, 1989.

Ecology asserts that because PTPC constructed and operated its two steam generating units before January 1, 1989, the exception in RCW 70.95.700 applies. PT Air Watchers, however, argues that PB10 was not used as an energy recovery facility prior to January 1, 1989, because the facility has not previously been used for generating electricity that may be sold to outside parties. Therefore, they contend that the exception does not apply. PT Air Watchers' argument is unpersuasive.

PB10 was installed in 1976 and has been burning wastewater residuals and biomass since that time. AR at 782, 792. PB10 will continue to burn wastewater residuals and biomass after the project is complete. These fuels are combusted to produce steam to support the mill operations and produce power. AR at 782. Here, PT Air Watchers cannot meet its burden of proving that solid waste was not burned in PB10 for the purposes of energy recovery prior to 1989. Instead, they argue that modifications to an existing energy

recovery facility trigger the requirements of RCW 70.95.700. This is not a persuasive reading of the statute. Energy recovery relates to converting solid waste into usable energy, not just producing electricity that may be sold to outside parties. This project does not involve the construction of a new solid waste or energy facility. It simply modifies the combustion units that have been in operation since before January 1, 1989.

Furthermore, PT Air Watchers' reading of the statute would render the exemption meaningless. SEPA review for an existing energy recovery facility is triggered only by some action modifying the facility. Under PT Air Watchers' reading of the statute, any action modifying an existing facility would be ineligible for the exemption and would require an EIS. Therefore, the exemption for existing facilities could never apply. "A fundamental canon of construction holds a statute should not be interpreted so as to render one part inoperative." *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 969, 977 P.2d 554 (1999). PB10 is an energy recovery facility that burns solid waste and has been operating since before 1989, so the exemption in RCW 70.95.700 applies. Accordingly, we hold that the Board correctly concluded that an EIS is not required under RCW 70.95.700.

CONCLUSION

Based on a reasonable interpretation of RCW 70.235.020(3) and sufficient information contained in the checklist, Ecology engaged in a reasoned assessment of the environmental impacts of the proposed project. We hold that Ecology and the Board correctly concluded that greenhouse gas emissions from the project would not have significant environmental impacts. We further hold that Ecology and the Board correctly concluded that the project would not result in adverse impacts to forest resources. Finally, because PB10 is an energy recovery facility that has been burning solid waste since before January 1, 1989, we hold that Ecology and the Board correctly concluded that an EIS is not required under RCW 70.95.700. We accordingly affirm the Board's decision.

WE CONCUR:

Madsen, C.J.

Johnson, J.

Owens, J.

Fairhurst, J.

Stephens, J.

Wiggins, J.

González, J.

George McCloud, J.