# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ERIC HIRST, LAURA LEIGH BRAKKE, )
WENDY HARRIS and DAVID )
STALHEIM, individuals, )
                      )
          Appellants, )
                      )
        v. )
                      )
GROWTH MANAGEMENT HEARINGS )
BOARD, WESTERN WASHINGTON )
REGION, an agency of the State of )
Washington, and WHATCOM COUNTY, )
a municipal corporation, )
                      )
          Respondents. )

No. 71739-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 30, 2014

TRICKEY, J — The Growth Management Act (GMA), chapter 36.70A RCW, requires that a comprehensive plan be internally consistent with all elements harmonious with the future land use map. Here, Whatcom County (County) adopted a policy which did not create an internal inconsistency; rather, it was a measure to contain and control rural development in compliance with the GMA. Further, substantial evidence supports the policy. We affirm.

## FACTS

In 2005, the Western Washington Growth Management Hearings Board (Board) issued a final decision and order in the case of <u>Futurewise v. Whatcom County</u>, No. 50-2-0013. The Board found that the County's criteria for establishing limited areas of more intensive rural development (LAMIRD) did not comply with the GMA.[1] Gold Star Resorts, Inc. had intervened and subsequently appealed the

---

[1] Board Record (BR) at 3835.

decision. Gold Star Resorts, Inc. v. Futurewise, 167 Wn.2d 723, 222 P.3d 791 (2009). The Supreme Court upheld the Board's findings that the County's comprehensive plan did not comply with the 1997 GMA requirements for LAMIRDs. The Supreme Court also held the Board erroneously applied a "bright line" rural density rule of no more than one residence per five acres. Gold Star, 167 Wn.2d at 726.

On May 10, 2011, the County adopted Ordinance No. 2011-013 amending the County's comprehensive plan to address the Supreme Court's decision in Gold Star. Several petitioners challenged various aspects of that ordinance.[2]

Eric Hirst, Laura Leigh Brakke, Wendy Harris, and David Stalheim (collectively, Hirst) intervened regarding the County's LAMIRD criteria, contending that the County's action failed to comply with the GMA.[3] The Board found that the County had not complied with portions of the GMA. In its final decision and order following remand on issue of LAMIRDs (2012 FDO),[4] the Board found that the County permitted a population in county rural areas far in excess of allocations elsewhere, thus creating plan inconsistency.

The 2012 FDO found that the County violated RCW 36.70A.070(5)(c) when it failed to include adequate measures to protect the rural character with the rural element of the plan.[5] The Board agreed with Hirst finding that "the County has not planned to ensure that its comprehensive plan and development regulations,

---

[2] BR at 3837.
[3] BR at 3838; see BR at 222 (First Amended Petition for Review).
[4] BR at 3832 (Final Decision and Order and Order Following Remand on Issue of LAMIRDS, Case Nos. 11-2-0010c and 05-2-0013 (January 9, 2012)).
[5] BR at 3952.

considered together, allocate rural population consistent with the [c]omprehensive [p]lan's population allocation. The additional residential development allowed in the County LAMIRDs conflicts with the goal of locating most population increases in [urban growth areas (UGA)] and encourages sprawl."[6]

The Board concluded:

[The County's] Comprehensive Plan amendments and development regulations permit a population in the County rural areas far in excess of the allocation elsewhere provided for in the County Comprehensive Plan, thereby creating Plan inconsistency in violation of RCW 36.70A.070 (preamble) and RCW 36.70A.130(1). [7]

In response to the Board's 2012 FDO and to comply with the GMA, the County passed Ordinance No. 2012-032 amending its comprehensive plan. As part of that ordinance, the County adopted Policy 2DD-1 to address rural population allocation.[8] The goal of Policy 2DD-1 is to retain the character and lifestyle of rural Whatcom County.[9] Policy 2DD-1 provides:

Concentrate growth in urban areas per the population projections in Chapter 1 of this plan, and recognize rural lands as an important transition area between urban areas and resource areas. By February 1 of each year the department will publish a report that monitors residential development activity outside the urban growth areas during the previous year and compares that data with the adopted population growth projection for those areas. If it is apparent that growth occurring outside the urban growth areas is inconsistent with adopted projections, the County shall take action to address the discrepancy. Actions may include changing the allocation of the projected population growth during the comprehensive plan update required per RCW 36.70A.130(1), or changing development regulations to limit growth outside the urban growth areas. In addition, as the County and cities review the capacity for growth in the urban growth areas, the county should coordinate with the cities

---

[6] BR at 3952 (2012 FDO at 121).
[7] BR at 3952 (2012 FDO at 121).
[8] BR at 4070-71; BR at 3832.
[9] BR at 4249.

to ensure that polices are in place that are consistent with encouraging growth in the urban areas and reducing demand for development in rural areas.[10]

Table 4 showing the total projected 2029 population assumes distribution of 85 percent growth to each urban area and the remaining 15 percent to unincorporated rural Whatcom County.[11] Unincorporated Whatcom County is described in Table 4 as "areas outside the UGA's, including rural and resource lands."[12] It further states:

> The 2008 population estimates – and, by extension, the 2029 population projections – rely on [the Office of Financial Management (OFM)] estimates that were based on 2000 census figures. After the 2010 census data were released, OFM revised its population estimates for the years between 2000 and 2010. As shown in in Figure 1, the revised estimate for the total 2008 County population is more than 6,000 persons higher than the one used to develop the Table 4 population projections. OFM did not provide revised estimates for the UGA (or non UGA) population in the years between 2000 and 2010, but Figure 1 shows an estimate of the non-UGA population assuming the proportion of non-UGA population held constant at about 32% of total County population in those years. The revised OFM estimates are shown in Figure 1 for illustrative purposes only; neither these estimates nor any projections based on them are adopted in this plan. The projections used in Table 4 and elsewhere in this plan will be revised using the most current OFM estimates and protections during the next UGA review, due in 2016.

> Outside the UGAs there is a large number of undeveloped tax parcels. While it is not clear exactly how many of these tax parcels are legally buildable lots, the total number of potential new dwelling units could theoretically accommodate population grown in excess of the rural population projection. However, because adequate land capacity is available for growth within urban growth areas, growth is not forced into the rural areas. Through the monitoring process described in Policies 2S-5 and 2DD-1 of this plan, the County will evaluate development activity in comparison with these urban and

---

[10] BR at 4249-50.
[11] BR at 4242 (Table 4).
[12] BR at 4242 (Table 4).

4

rural growth projections and take action as necessary to address discrepancies if any are identified.[13]

Hirst again petitioned the Board asserting that the County's actions still failed to comply with the GMA.[14] The Board upheld Policy 2DD-1 in its compliance order on January 4, 2013.[15] The Board found that in its adoption of Ordinance No. 2012-032, the County took numerous actions to reduce over-capacity in its rural lands, amended provisions to acknowledge the over-capacity, and adopted an annual review process to monitor and correct any problems.[16] The Board found that the annual review process set forth in Policy 2DD-1 was a "measure to contain and control rural development" that complied with RCW 36.70A.070(5)(c)(i).[17]

Hirst appeals the Board's order. Division Two granted direct review and then transferred the case to Division One.

## ANALYSIS

### Standard of Review

This court reviews a Board's decision under the Administrative Procedure Act (APA), chapter 34.05 RCW. PT Air Watchers v. State, Dep't of Ecology, 179 Wn.2d 919, 925, 319 P.3d 23 (2014). The Supreme Court set forth the standard of review in Lewis County v. Western Washington Growth Mgmt. Hearings Bd., 157 Wn.2d 488, 497-98, 139 P.3d 1096 (2006):

> The Board is charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations. RCW 36.70A.280, .302. The Board "shall find compliance" unless it

---

[13] BR at 4242 (Table 4).
[14] BR at 4662 (Objection to Finding of Compliance).
[15] Clerk's Papers (CP) at 19-235 (Compliance Order and Order Following Remand on Issue of LAMIRDS (2013 CO)).
[16] CP at 45 (2013 CO at 27).
[17] CP at 47 (2013 CO at 29).

determines that a county action "is clearly erroneous in view of the entire record before the board and in light of the goals and requirements" of the GMA. RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must have a "firm and definite conviction that a mistake has been committed." Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wn.2d 179, 201, 849 P.2d 646 (1993). On appeal, we review the Board's decision, not the superior court decision affirming it. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wn.2d 543, 553, 14 P.3d 133 (2000) (hereinafter referred to as Soccer Fields). "'We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court.'" Id. (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wn.2d 38, 45, 959 P.2d 1091 (1998)). . . .

The legislature intends for the Board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.3201. But while the Board must defer to Lewis County's choices that are consistent with the GMA, the Board itself is entitled to deference in determining what the GMA requires. This court gives "substantial weight" to the Board's interpretation of the GMA. Soccer Fields, 142 Wn.2d at 553.

Policy 2DD-1

Hirst contends the Board incorrectly interpreted the GMA when it concluded that Policy 2DD-1 cured any inconsistency. Hirst argues that the County's proposal to reconcile any inconsistencies by annually reviewing the population growth is not consistent with planned growth. In part, Hirst premises his argument on the County's adoption of OFM projections of a population of 247,755 in 2029.[18] The 2010 census indicated a population of 65,041 in county rural areas, which would allow for only 2,651 additional people by 2029.[19]

Hirst submitted evidence that the vacant lots presently available in the rural areas can accommodate 33,696 additional people, when only 2,651 are

---

[18] BR at 4243 (Table 4).
[19] BR at 3951.

expected.[20] Thus, Hirst argues, accommodating that many is inconsistent with the population plan.

Hirst's argument is not persuasive. It does not acknowledge the County's efforts to forestall any potential inconsistency in the future by its annual review. The County acknowledges that the population capacity of developable rural parcels exceeds the population allocation to non-UGAs in its comprehensive plan.[21] This recognition is not inconsistent with the statute.

RCW 36.70A.070 provides that "[t]he [comprehensive] plan shall be an internally consistent document and all elements shall be consistent with the future land use map." RCW 36.70A.070(1) requires a land use element that "shall include population densities, building intensities, and estimates of future population growth." Thus, the Board concluded that logically "population densities and building intensities must be consistent with the estimates of future growth."[22] RCW 36.70A.130(1)(d) requires that "[a]ny amendment of or revision to development regulations shall be consistent with and implement the comprehensive plan."

The GMA provides that each county is required to designate "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1). UGA designations shall be included in a county's comprehensive plan. RCW 36.70A.110(6). The intent of the GMA is that cities and counties will work together to reach agreement on the correct size of a UGA. RCW 36.70A.110(2). That UGA designation "cannot exceed the

---

[20] BR at 3951-52.
[21] CP at 42 (2013 CO at 24).
[22] CP at 43 (2013 CO at 25).

amount of land necessary to accommodate the urban growth projected by OFM, plus a reasonable land market supply factor." Thurston County v. Western Washington Growth Mgmt. Hearings Bd., 164 Wn.2d 329, 352, 190 P.3d 38 (2008).

Thus, as the Board concluded, the GMA is explicit about capacity for urban growth.[23] The County's comprehensive plan must ensure that UGAs and cities "include areas and densities sufficient to permit the urban growth that is projected to occur in the county or city for the succeeding twenty-year period." RCW 36.70.A.110(2).

The Board correctly noted that the GMA is not explicit as to rural population.[24] The question before the Board was whether the County's plan allows a development capacity in rural areas that is inconsistent with the comprehensive plan's adopted population projections. In reviewing the statutes, the Board found "that RCW 36.70A.215(1) requires a population/land capacity evaluation for counties and cities to establish 'urban densities within urban growth areas.'"[25] However, RCW 36.70A.215(7) provides:

> The provisions of this section shall apply to counties, and the cities within those counties, that were greater than one hundred fifty thousand in population in 1995 as determined by office of financial management population estimates and that are located west of the crest of the Cascade mountain range. Any other county planning under RCW 36.70A.040 may carry out the review, evaluation, and amendment programs and procedures as provided in this section.

(Emphasis added.)

---

[23] CP at 43 (2013 CO at 25).
[24] CP at 43 (2013 CO at 25).
[25] CP at 44 (2013 CO at 26).

OFM never designated Whatcom County as a buildable lands county.[26] The Board found "the County has adopted an annual review process, allowed by the GMA as a discretionary action, to assess population growth and potential rural land discrepancies. The County has voluntarily undertaken this monitoring and response process as provided in RCW 36.70A.215(7): 'Any other county planning under RCW 36.70A.040 may carry out the review, evaluation, and amendment programs and procedures as provided in this section.'"[27]

This court only overturns the Board where one is definitely and firmly convinced that a mistake has been made. RCW 36.70A.3201 provides:

> In recognition of the broad range of discretion that may be exercised by counties and cities consistent with the requirements of this chapter, the legislature intends for the board to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter

(Emphasis added.) Under this high standard of clear error the legislature has established that a county's exercise of its discretion will not be overturned unless found to be clearly erroneous in light of the goals and requirements set forth in the GMA. The Board's conclusion that Policy 2DD-1 is a "measure to contain and control rural development" that complies with RCW 36.70A.070(5)(c)(i) is well taken.[28] Here, the Board correctly interpreted RCW 36.70A.070 and RCW 36.70A.130(1)(d) in its conclusion that the County had cured any inconsistency when it adopted Policy 2DD-1.

---

[26] CP at 44 (2013 CO at 26 n.81); see WAC 365-196-315(2)(a) and (b) providing that only six counties: Clark, King, Kitsap, Pierce, Snohomish, and Thurston must establish a buildable lands program.
[27] CP at 46 (2013 CO at 28).
[28] CP at 47 (2013 CO at 29).

Substantial Evidence

Hirst argues that substantial evidence does not support the Board's conclusion that Policy 2DD-1 did not violate the GMA. Hirst argues that the rural discrepancies were inconsistent and that therefore corrective action of yearly evaluating "potential" rural discrepancies is contrary to the Board's finding no inconsistency. Hirst argues that by having 33,696 areas available for development when the County has planned for only 2,651 is inconsistent and presents significant problems to the comprehensive plan in two ways. First, Hirst contends that the County is not planning but rather reacting. He further asserts that the County will only possibly react when more than 2,651 additional people live in the rural areas. Second, Hirst contends there is nothing to conclude that the County will react. Both of these contentions are without merit.

The Board concluded that Policy 2DD-1 permitted the County to control rural development. The language used in the policy clearly states that "the County will evaluate development activity in comparison with the urban and rural growth projections and take action as necessary to address discrepancies if any are identified."[29] Indeed, as the Board noted, the policy gives the County the ability to react more quickly.

The policy provides that if growth is inconsistent with adopted projections, the County <u>shall take</u> action to address the discrepancy.[30] The use of the word "may" subsequent to the action undertaken does not relieve the County of taking action. The "may" refers to various solutions that the County might undertake to

---

[29] BR at 4242 (Table 4).
[30] CP at 46 (2013 CO at 28).

10

achieve its required compliance. Under these circumstances the Board did not err. The record contains "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 164 Wn.2d 768, 780, 193 P.3d 1077 (2008) (internal quotation marks omitted) (quoting City of Redmond, 136 Wn.2d at 46).

Affirmed.

Trickey, J.

WE CONCUR:

Leach, J.        Cox, J.