**FILED**
**OCTOBER 11, 2023**
**In the Office of the Clerk of Court**
**WA State Court of Appeals Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KLICKITAT LAND PRESERVATION FUND, and DENNISON AND BONNIE WHITE, | ) ) ) ) | No. 38927-8-III |
| Appellants, | ) ) | |
| FRIENDS OF OAK RIDGE, | ) ) | UNPUBLISHED OPINION |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KLICKITAT COUNTY, UNDER CANVAS, INC., and LONGVIEW TIMBERLANDS LLC, | ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, J.P.T.\* — Klickitat Land Preservation Fund (KLPF) and Dennis and

Bonnie White appeal a superior court decision affirming Klickitat County's (County)

mitigated determination of nonsignificance (MDNS) for a proposed camping resort east

of the White Salmon River. They also appeal its decision affirming the County hearing

examiner's approval of conditional use and recreation park permit applications. The

permit applications and MDNS had met with local opposition, particularly over adverse

---

\* Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter. She signed the opinion as a judge pro tempore of the court pursuant to RCW 2.06.150.

environmental impacts that opponents contended would result from materially increased traffic on a local access road.

We affirm the superior court on all issues except its disposition of KLPF's and the Whites' argument that the hearing examiner failed to make findings required by Klickitat County Code (KCC) sections 19.53.130.A.3 and A.4. On that issue, we remand the matter to the hearing examiner with directions to address the required findings. We retain jurisdiction for the purpose of our commissioner addressing a request by Under Canvas, Inc. for an award of reasonable attorney fees and costs following the hearing examiner's entry of findings.

FACTS AND PROCEDURAL BACKGROUND

Under Canvas, Inc. described itself as follows when it applied in 2020 for conditional use and recreation park permits to develop a luxury camping resort within an undeveloped 119-acre piece of land in rural Klickitat County:

> Under Canvas, Inc. is a private company that develops and operates outdoor luxury camping ("glamping") camp sites across the United States. The camping experience is known as a "glamping" experience because unlike traditional camping where a guest provides their own supplies, Under Canvas provides everything needed for camping, including safari-style tents with amenities such as daily housekeeping, beds, linens and towels, en suite bathrooms, hot running water, and a wood-burning stove. Under Canvas designs camps to promote minimal land disturbance while maximizing outdoor protection, open space management, and outdoor education.

2

Administrative Record (AR) at 95.  Under Canvas explained it was then operating

glamping locations in Yellowstone and Glacier in Montana; Moab and Zion in Utah;

Mount Rushmore in North Dakota; the Great Smoky Mountains in Tennessee; and Grand

Canyon in Arizona.  It identified the campsite it proposed for Klickitat County as its

Columbia River Gorge Project.

Weyerhaeuser Timber Company had previously owned and operated the 119-acre

project site as an industrial tree farm.  Under Canvas proposed to construct its campsite

on an interior 27 acres, much of which was left with clear-cut debris and slash following

a 2014 timber cut.  The 92 remaining acres would be used and maintained as long-term

forestry acreage.  Approximately 30 acres of the property is located within the Lower

White Salmon Wild and Scenic River Corridor administered by the U.S. Forest Service,

and Under Canvas was exploring that acreage being acquired by or donated to the Forest

Service.

Under Canvas engaged Environmental Science Associates (ESA) to provide

support in permitting the project and Under Canvas and ESA personnel conducted site

visits and had a preapplication meeting with Klickitat County staff in February 2020.

Under Canvas submitted a SEPA[1] checklist and applications for a zoning conditional use

permit (CUP) and recreation park permit at the beginning of July 2020.

---

[1] State Environmental Policy Act, chapter 43.21C RCW.  *See* RCW 43.21C.900.

No. 38927-8-III
*Klickitat Land Preservation Fund, et al. v. Klickitat County, et al.*

Klickitat County Planning Director Mo-chi Lindblad, who served as the SEPA responsible official for the planning department, issued a MDNS for the proposal in late August 2020 and sent a 6-page notice of the conditional use application and preliminary MDNS to the public (including to KLPF), and to tribes, and local and state agencies.

The notice disclosed that documents submitted with the applications included a critical areas report and impact analysis, and a cultural resource report prepared by ESA; a traffic access and impact study memorandum prepared by DKS Associates; a wildfire mitigation plan and forest management plan prepared by Washington Forestry Consultants, Inc., and a typical structures plan set prepared by Under Canvas. The notice provided a description of the proposal for the 95-tent camping facility, including the following:

> Camping would be offered April through October (weather dependent).
> The tents would be a mix of standard safari-style structures using shared
> restroom facilities placed throughout the site and deluxe tents with en suite
> bathrooms. Tents would be equipped with wood-burning stoves for heat
> designed for use in such facilities, complete with spark arrestors and heat
> shields. No smoking, campfires, food, or cooking facilities would be
> permitted at individual tent locations.
>
> Guest tents would be supported by a central lobby including kitchen and
> dining area for guests as well as additional guest amenities. Guest tents
> may be taken down at the end of the season and placed into on-site storage,
> while the lobby tent would remain year-round.

AR at 1286 (format modified).

4

The notice identified planned facilities as the guest tents; two communal bathroom facilities; one lobby/check in tent that would provide food service, with an approximate 4,500 square foot pad and 3,200 square foot interior; and two communal fire pits that would be started, maintained, monitored and extinguished by staff. Individual guest tents would not be wired for electricity but the main lobby tent and back-of-house facilities would be. Solar lighting would be used on paths. Water would be provided by an on-site public water supply well, and sewer would be handled by an on-site septic system. Golf carts operated by staff would be used for on-site circulation.

The notice invited review and comment on the proposed project and its probable environmental impacts by September 18, 2020.

Over seven dozen public comments were received from individuals and eight comments were received from state and local agencies. Agency and local government comments suggested or endorsed mitigation requirements in some cases, but no agency, tribe, or local government expressed a concern that the Columbia River Gorge project would have a probable adverse impact on the environment.

Public comments, however, presented local concerns and opposition. According to Pamela Xander, the senior planner from ESA, the majority of public comments related to wildfires, the wild and scenic river corridor, the western gray squirrel (an endangered species with nests in the project area), traffic, water supply, hydrology and compatibility

with land uses and adjacent property. Public concerns about increased traffic, related safety issues, and its impact on egress and ingress in the event of wildfires, focused on characteristics of Oak Ridge Road, the local access road that fronts an easement that serves as the entrance to the Under Canvas property.

Oak Ridge Road connects to BZ Glenwood Highway on the north, and on the south, to State Route (SR) 141, at the town of Husum. The map below is from the final traffic impact study prepared by DKS. It depicts the rectangular 119-acre property and the easement and interior road that one would take from Oak Ridge Road to the campsite location. (The three intersections circled on this depiction were those that County planners suggested DKS analyze for traffic impacts, but traffic impact on the intersections is not at issue on appeal.)

(Remainder of this page intentionally left blank.)



AR at 307. SR 141 is a state route that is classified as a local rural principal arterial and

has a 55 m.p.h. posted speed limit. BZ Glenwood Highway is classified as a rural major

collector, and has a 50 m.p.h. posted speed limit. Based on guest origins and

destinations, it was estimated that trip distribution would be 85 percent from and to the

south, and 15 percent from and to the north.

While different measures are given for the total length of Oak Ridge Road, the

most reliable measure appears to be that it is 6.5 miles long.[2]  The easement off Oak

Ridge Road that would be used to enter the campsite is located about 4.3 miles north of

its southern terminus at SR 141, on a stretch of the road that is unpaved gravel.

According to Jeff Hunter, the deputy director of Klickitat County's public works

department, the gravel stretch at that location is 1.9 miles long, with an estimated .3 miles

of the 1.9 mile gravel stretch extending north from the easement entrance to the Under

Canvas property, while 1.6 miles of gravel road extends to the south.

Opponents of the Columbia River Gorge project pointed out in comments that Oak

Ridge Road has many curves and limited sightlines, with grades as steep at 8 percent, and

a posted speed limit of 25 m.p.h. for most of its length.  While some opponents described

much of the road as steep, a KLPF-retained traffic expert, Ross Tilghman, said it is more

fairly described as rolling terrain than mountainous terrain.  The original submissions for

permitting, including DKS's traffic studies, assumed that Oak Ridge Road was the

County's required 20-foot width for its entire length, but comments submitted by

---

[2] The record includes references to it being approximately 6 miles long and being 7 miles long; we rely on several DKS and County references to it being 6.5 miles long. *See, e.g.*, AR at 197, 311; Clerk's Papers (CP) at 248.

appellant Dennis White contended that he had measured many sections of the gravel road that were narrower. The County later agreed that the surface of about 260 feet of the gravel section of Oak Ridge Road on which the easement entrance to the project site is located was between 18.1 feet and 19.2 feet wide.[3] Similar to other rural roads, Oak Ridge Road has no sidewalks or wide shoulders.

The many public comments caused County planners to request additional information from Under Canvas. County staff also provided feedback to DKS in September 2020 that led DKS to prepare a revised traffic impact study in October 2020. County staff decided to hire Skillings, Inc. to conduct a technical review of DKS's revised traffic impact study.

On October 20, 2020, Ms. Lindblad gave notice that she was withdrawing the preliminary MDNS, that Under Canvas wished to address the comments, and that "[a] new SEPA threshold determination will be issued after review of the pertinent information." AR at 1292-93.

A revised SEPA checklist was submitted by Under Canvas in November 2020 and was determined to be substantially complete on December 15, 2020. In the interim,

---

[3] At the SEPA hearing, Deputy Director of Public Works Hunter testified that at milepost 4.13, there was an approximately 80-foot section whose narrowest width was 18.6 feet; at milepost 402, there was a 115-foot stretch that was 18.2 feet wide at the narrowest; at milepost 4.37, there was a 38-foot section that was 18.1 feet wide at its narrowest point; and at milepost 3.45, there was a 27-foot stretch that was 19.2 feet wide. CP at 786.

9

Skillings had provided its comments on DKS's revised traffic impact study, which led DKS to make what it describes as "minor revisions" reflected in a final traffic impact study it delivered to County staff in December 2020. AR at 306.

On December 25, 2020, Ms. Lindblad again found, based on the supplemental information, that the proposal would not have a probable adverse impact on the environment and she again issued a MDNS, this time identifying 43 mitigation measures required for the project. She announced an appeal deadline of January 22, 2021, and again invited comments. KLPF and the Whites timely filed an appeal.

Klickitat's county code provides that if a public hearing is required on an action that is subject to a SEPA appeal, then the SEPA appeal hearing shall be combined with the public hearing. *See* KCC 20.28.030(A)(1)(f). In February 2021, the board of county commissioners adopted a resolution delegating the combined hearing on the Under Canvas matters to its hearing examiner, Andrew Kottkamp. Following a contested hearing conducted by Mr. Kottkamp on July 29 and 30, 2021, he affirmed the MDNS and approved Under Canvas's applications for conditional use and recreation park permits. His approval of the conditional use and recreation park permits included 62 conditions of approval.

KLPF and the Whites sought judicial review under the Land Use Petition Act (LUPA), chapter 36.70C RCW. They contended the MDNS should be reversed because

10

the County inadequately investigated the proposed project's impacts on traffic and traffic safety, dust, cattle usage of Oak Ridge Road, fire, and evacuation issues, and that its threshold determination was unsubstantiated and clearly erroneous. They also challenged several of the MDNS's mitigation measures as too vague to satisfy a mitigation specificity requirement imposed by the KCC. Finally, they challenged the hearing examiner's permitting decision, contending, in part, that he failed to make findings required by the KCC. Under Canvas filed its own request for judicial review of eight of the conditions of approval imposed by the hearing examiner.

The LUPA actions were consolidated. By the time the consolidated petitions were heard, Under Canvas had withdrawn some of its challenges, and sought reversal of only five of the conditions of approval.

The superior court ruled that in issuing the MDNS, the County complied with SEPA procedure. It found KLPF's and the Whites' environmental impact concerns to be speculative, sufficiently mitigated, or refuted by the record. It also affirmed approval of the CUP and recreation park permit. It concluded that the hearing examiner's failure to enter findings required by KCC 19.53.130.A with respect to whether the "'property is suitable for the proposed use'" and whether "'public facilities and services to serve the use are adequate for the proposed use'" was harmless error, "when considering the plethora of evidence supporting those two criteria." Clerk's Papers (CP) at 523.

11

As for the conditions of approval challenged by Under Canvas, the court struck a condition that required biennial compliance reports, retained jurisdiction in the hearing examiner, and allowed the county to modify or add new conditions, as exceeding the hearing examiner's authority. It annulled a condition that prohibited weddings, concerts, or other public or private gatherings as ambiguous, unclear, and inappropriate. It struck a condition that prohibited recreational vehicle parking as overly broad and unrelated to a legitimate land use or zoning control. It affirmed two conditions that required Under Canvas to monitor water use.

KLPF and the Whites appeal the superior court's decision.

ANALYSIS

KLPF and the Whites assign error to the superior court's decisions (1) upholding the MDNS, (2) to the extent the court affirmed approval of the conditional use and recreation park permits, and (3) modifying or eliminating three of the hearing examiner's conditions of approval. They assign error to the hearing examiner's (1) decision on their SEPA appeal and 28 of his supporting findings of fact and one of his supporting conclusions of law, and (2) approval of Under Canvas's permit applications and 14 of his supporting findings of fact and 7 of his supporting conclusions of law.

They organize their briefing on appeal around particular environmental issues, however, and we follow that organization by addressing, in order, fire-related impacts,

12

traffic-related impacts, dust and cattle-related impacts, and the appellants' objections to the superior court's modification or elimination of three of the hearing examiner's conditions of approval. First, however, we summarize requirements of local government SEPA review and project approval, and the bases and standards for judicial review.

I.    LOCAL GOVERNMENT ENVIRONMENTAL REVIEW AND APPROVAL OF LAND USE PROJECTS, AND JUDICIAL REVIEW

A.    *SEPA determinations and local government appeal*

"Under SEPA, before a local government processes a permit application for a private land use project, it must make a 'threshold determination' of whether the project is a 'major action significantly affecting the quality of the environment.'" *Anderson v. Pierce County*, 86 Wn. App. 290, 300-01, 936 P.2d 432 (1997) (quoting RCW 43.21C.030(2)(c)). A determination of significance (DS) mandates intensified environmental review through preparation of an environmental impact statement (EIS). *Id.* at 301 (citing WAC 197-11-360). SEPA imposes this requirement that environmental values be given appropriate consideration in local government decision-making along with economic and technical considerations, in order to shape the people's future environment by deliberation, not default. *Norway Hills Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 272, 552 P.2d 674 (1976).

"A 'significant' impact means a 'reasonable likelihood' exists that the proposal will have 'more than a moderate adverse impact on environmental quality.'" *Wild Fish*

*Conservancy v. Dep't of Fish & Wildlife*, 198 Wn.2d 846, 873, 502 P.3d 359 (2022) (quoting WAC 197-11-794(1)). "'[A]n agency does not have to consider every conceivable environmental impact when making its threshold SEPA determination.'" *Id.* (quoting *PT Air Watchers v. Dep't of Ecology*, 179 Wn.2d 919, 932, 319 P.3d 23 (2014)). SEPA requires consideration of environmental impacts "with attention to impacts that are likely, not merely speculative." *Id.* (quoting WAC 197-11-060(4)(a)).

To facilitate the making of the threshold determination, the applicant must prepare an environmental checklist, which must provide information reasonably sufficient to evaluate the proposal's environmental impact. *Anderson*, 86 Wn. App. at 301 (citing WAC 197-11-315 to 335). The responsible official for the lead agency of the local government processing the permit application must (1) "[r]eview the environmental checklist"; (2) "[d]etermine if the proposal is likely to have a probable significant adverse environmental impact, based on the proposed action, the information in the checklist (WAC 197-11-960), and any additional information furnished under WAC 197-11-335 and 197-11-350"; and (3) "[c]onsider mitigation measures" that the agency or applicant will implement as part of the proposal." WAC 197-11-330(1).

In making a threshold determination, the responsible official should determine whether impacts have been analyzed in a previously prepared environmental document that can be adopted or incorporated by reference, as well as whether "[e]nvironmental

14

analysis would be more useful or appropriate in the future in which case, the agency shall commit to timely, subsequent environmental review." WAC 197-11-330(2). In determining an impact's significance, the responsible official must consider, among other factors, that, "[f]or some proposals, it may be impossible to forecast the environmental impacts with precision, often because some variables cannot be predicted or values cannot be quantified." WAC 197-11-330(3)(d).

The threshold determination must be based on "information reasonably sufficient to evaluate the environmental impact of a proposal." WAC 197-11-335. If, after reviewing the checklist, the agency concludes it needs more information to make its threshold determination, it may (1) require the applicant to submit more information, (2) "[m]ake its own further study, including physical investigations on a proposed site," (3) consult with other agencies and request information on potential impacts within the other agencies' jurisdiction or expertise, or (4) "[d]ecide that all or part of the action or its impacts are not sufficiently definite to allow environmental analysis and commit to timely, subsequent environmental analysis." WAC 197-11-335(1)-(4).

"If the responsible official determines there will be no probable significant adverse environmental impacts from a proposal, the lead agency shall prepare and issue a determination of nonsignificance (DNS)." WAC 197-11-340(1). The responsible official may also issue a MDNS, which involves changing or conditioning a project "to mitigate

15

the impacts that would lead an agency to consider a DS likely." WAC 197-11-350(2); *Anderson*, 86 Wn. App. at 301. "With a MDNS, promulgation of a formal EIS is not required." *Anderson*, 86 Wn. App. at 301.

The responsible official's threshold determination may be challenged for compliance with SEPA's substantive and procedural provisions by appeal to the agency that made the threshold determination. RCW 43.21C.075. Some local jurisdictions, like Klickitat County, appoint a hearing examiner to review the responsible official's threshold determination. The local jurisdiction's land use decision is then subject to judicial review under the LUPA.

B.      *Judicial review*

"Under LUPA, we 'stand[ ] in the shoes of the superior court and review[ ] the hearing examiner's action on the basis of the administrative record.'" *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 767, 129 P.3d 300 (2006) (alterations in original) (quoting *Pavlina v. City of Vancouver*, 122 Wn. App. 520, 525, 94 P.3d 366 (2004)). "[W]e must give substantial deference to both the legal and factual determinations of a hearing examiner as the local authority with expertise in land use regulations." *Lanzce G. Douglass, Inc. v. City of Spokane Valley*, 154 Wn. App. 408, 415, 225 P.3d 448 (2010).

A court may grant a party relief from a local jurisdiction's land use decision only if that party satisfies one of six statutory standards. KLPF and the Whites challenge the County hearing examiner's decisions based on two: that the challenged decisions "[are] not supported by evidence that is substantial when viewed in light of the whole record before the court," as provided by RCW 36.70C.130(1)(c), and that the land use decisions "[are] a clearly erroneous application of the law to the facts," as provided by RCW 36.70C.130(1)(d).[4]

In reviewing a challenged land use decision for substantial evidence under subsection (c), "substantial evidence" is "a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 829, 256 P.3d 1150 (2011). "[W]e view facts and inferences in a light most favorable to the party that prevailed in the highest forum

---

[4] Under Canvas assumes that KLPF and the Whites seek relief under RCW 36.70C.130(1)(b) and (c) because in their brief's only reference to RCW 36.70C.130(1), they cite only those two subsections. They cite (1)(b) not for the basis on which it supports relief, however (that the decision "is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise") but for the proposition that "[q]uestions of law are reviewed de novo." Opening Br. of Appellants at 36.

KLPF and the Whites repeatedly discuss the substance of (1)(c)'s and (1)(d)'s standards. Opening Br. of Appellants at, e.g., 46-47 ("To the extent the examiner's findings and conclusions address these issues at all, they are *clearly erroneous* and not supported by *substantial evidence*.") (emphasis added); 49 (clearly erroneous); 53 (clearly erroneous and not supported by substantial evidence); 59 (same); 62 (same). Their brief never mentions RCW 36.70C.130(1)(b)'s "erroneous interpretation of the law" standard.

17

exercising fact-finding authority"—here, in the light most favorable to Under Canvas and the County. *Id*. at 828-29. We defer to the hearing examiner's weight and credibility determinations. *Friends of Cedar Park Neigh. v. City of Seattle*, 156 Wn. App. 633, 641-42, 234 P.3d 214 (2010).

Under subsection (d), a hearing examiner's finding or application of the law to the facts is clearly erroneous when, although evidence supports it, "the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." *Phoenix Dev., Inc.*, 171 Wn.2d at 829. A MDNS is afforded substantial weight under the clearly erroneous standard. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000); *Moss v. City of Bellingham*, 109 Wn. App. 6, 13-14, 31 P.3d 703 (2001). "For the MDNS to survive judicial scrutiny, the record must demonstrate that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA and that the decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact." *Wenatchee Sportsmen Ass'n*, 141 Wn.2d at 176.

This court may affirm or reverse any or all of the land use decisions under review, or it may remand any or all of the decisions for further proceedings. RCW 36.70C.140.

II.     FIRE DANGER-RELATED IMPACTS

KLPF and the Whites contend, as it relates to the Columbia River Gorge Project's fire danger-related impacts, that the hearing examiner's decisions are erroneous in three reversible ways.  First, they argue that the County did not demonstrate prima facie compliance with SEPA because it failed to evaluate the local fire district's capacity to respond to a wildfire at the project site and failed to assess the feasibility of a mass evacuation in the event of a wildfire.  Second, they contend that MDNS conditions 29 and 30 violate a County specificity requirement imposed by KCC 20.12.040.E.3.  Third, they challenge the permitting decision as failing to include required findings.

A.     *Challenge to Prima Facie Compliance with SEPA*

Relevant evidence

We begin by elaborating on the evidence relevant to the issues challenged on appeal.  Again, we review the evidence and inferences in a light most favorable to Under Canvas and the County.

A staff report prepared by the County planning department in April 2021 for the hearing examiner addressed, in part, policy #5 of section 2 of the County's comprehensive plan, requiring that proposed developments be reviewed for "adequacy of access and circulation by emergency law enforcement and fire vehicles and adequacy of water provision for fire."  AR at 8.  Staff reported that Under Canvas representatives had

consulted with the fire chief of the Klickitat County Fire District 3 and representatives from the Washington State Department of Natural Resources (DNR) at the project site in January 2020, and initial verbal recommendations were provided to Under Canvas at that time. Fire District 3 Chief Wesley Long affirmed when testifying at the SEPA hearing that the site visit took place, although he did not recall the dates.

As chronicled above, among materials submitted with Under Canvas's SEPA checklist were a forest management plan and a wildfire mitigation plan. They were prepared by Galen Wright of Washington Forestry Consultants, Inc. in March 2020 and June 2020, respectively. Staff reported that the Forest Management Plan provided that the existing slash or landing piles of wood debris would be cleaned up, with special attention not to disturb soils on the steep slopes. Additional forestry management efforts would include revegetation in clear-cut areas and thinning of dense stands for forest health and wild fire mitigation.

Two sections of Under Canvas's SEPA checklist discussed its wildfire mitigation plan and why it believed its operations would not result in an increased need for fire protection. It included the following discussion of its wildfire mitigation plan:

> Under Canvas understands that wildfires are of concern and will work with the local, state, and federal agencies to make sure that the proposed project is vigilant to prevent and proactively respond to potential wildfires. The proposed project will comply fully with all authorities, their respective mandates and the guidelines of the Klickitat County Comprehensive

Emergency Management Plan . . . and the Klickitat County Community Wildfire Protection Plan 2018.

Under Canvas is committed to improving the fire safety of the surrounding community not only through the proposed project but also as a participant in the creation of a fully comprehensive Firewise Adaptive Community in coordination with neighbors, Fire District 3 and Washington State Department of Natural Resources. A Wildfire Mitigation Plan will be prepared. In addition, Under Canvas will do the following:

> • Meet with Fire District #3 and Washington State Department of Natural Resources (DNR) at an appropriate date and time to ensure provisions within the Wildfire Mitigation Plan are understood and will be adhered to. This is also noted in Section IV paragraph 20 of the Wildfire Mitigation Plan.

> • An Emergency Preparedness Plan similar to the Under Canvas plan for the site located in Montana will be provided to Fire District #3 prior to permit completion. The plan will be designed for the Columbia River site and abide by Fire District #3 and DNR guidance on incident specific response where shelter in place may be an option.

. . . .

> • Under Canvas will coordinate with Fire District #3 for annual fire safety surveys.

All project roads will meet Klickitat County Fire Access road Standards of Title 12 (specifically 12.20.303 (2)(f)[)] prior to issuance of occupancy permitting. Due to fire danger of parking on vegetation during dry conditions, the parking lot will meet Public Works standards for minimum depth of gravel[.] The vegetation management plan outlined on page 14 will be implemented to preserve the road as well as mitigate for fire dangers. Public Works Design construction details will be produced by a Washington base engineer, complying to local, state and federal legislation. This will include, but is not limited to, ADA, storm water, Fire Access. Under Canvas will meet the standards required by Fire District #3 and Klickitat Public Works including: Sizing, location and accessibility of stand pipes; and all project roads will meet county Fire Access road Standards of Title 12iii.

. . . .

Though no additional mitigations have been deemed necessary, Under Canvas is willing to explore partnering with neighbors and local fire agencies to provide a fire hydrant at the property access to Oak Ridge Road and associated fire water storage on property. An effort Under Canvas understands would not only mitigate fire risk for the broader community but also could curb insurance rates for surrounding properties.

AR at 137-38.

The checklist included the following discussion of why Under Canvas believed its operations would not create an increased need for fire protection:

No increase in the need for public services is expected to result from the proposed project. The project already incorporates many measures to reduce the need for additional fire protection. Some of the measures are described below and in more detail in the Fire Wise Plan that would be developed and approved and the Wildfire Mitigation Plan (See Appendix D). Appendix D also includes an Emergency Preparedness Plan.

**Best Practices -** Best practices that Under Canvas uses to reduce fire risk include:

• The Under Canvas tents are made of fire-retardant materials and pressure-treated wood to reduce fire risk.

• The stoves have code compliant chimney spark arrestors. The spark arrestors are constructed of woven or welded wire screening of 12 USA standard gage wire (0.1046 inch) with openings. The net free area of the spark arrestor shall not be less than four times the net free area of the outside of the chimney outlet. The ashes are removed by staff in metal containers and disposed of in a steel container.

• Fires are managed by staff and there are strict protocols for storage of fuel.

• Fire extinguishers are provided at each tent.

• Yard hydrants would be located adjacent to all fire pits.

• The proposed camp site would have prefabricated, mobile structures including kitchen, bathroom, laundry, and storage facilities that are built with fire-resistive materials.

• Preparation of a Fire Wise Plan.

**Fire Protection -** Wildfire protection to the Under Canvas Columbia River Gorge Project would be the responsibility of the Klickitat Fire District #3, with the closest fire station located in Husum, a few miles away. The most direct access is via State Highway 141[ ]and Oak Ridge Road.  Fire Wise Plans would be reviewed for comment by representatives of Fire District #3 as part of the CUP process.  Under Canvas would abide by all applicable seasonal burn bans at the camp site.

FPA Class IV General and Associated Forest Management Plan
**Fire Protection -** The risk of wildfire on the parcel is currently Moderate to High.  Forest thinning and site cleanup proposed as part of the project would reduce fire risk on the property.  The parcel is also protected by DNR because it is designated forest land (Western Forestry Consultants 2020a). . . .

**b. Proposed measures to reduce or control direct impacts on public services, if any. [help]**

Camp Site

**Emergency Protocol -** All Under Canvas staff would be trained in emergency procedures for inclement weather (severe storms), fire, and response for on-property medical emergencies.  Emergency responders would have access to each tent site.  Each guest tent would be numbered and an emergency exit plan would be submitted to the County for approval.

**Fire Risk and Defensible Space -** Fires would be allowed only in the fire pits and would be managed by camp staff.  Smoking would only be allowed in designated areas, and no smoking or campfires would be allowed at tent sites.  Areas around tents and other facilities would be kept clear of dead wood and vegetation for fuel reduction.  The water supply system would have a hose and yard hydrant at the fire pits and in other areas around the camp site for quick response situations.  Smoke detectors and carbon monoxide alarms would be provided in each guest tent.  Each tent with a wood-burning stove would also include a fire extinguisher.

. . . .

Additional detail on fire prevention measures for the project are listed below.

. . . .

• An Emergency Preparedness Plan similar to the Under Canvas plan for the site located in Montana will be provided to Fire District #3 prior to permit completion. The plan will be designed for the Columbia River site and abide by Fire District #3 and DNR guidance on incident specific response where shelter in place may be an option.

• A small portable pump will be provided near the pond for emergency use as recommended by Fire District #3 and will be to the specifications identified by the Fire District.

AR at 147-48.

Staff reported to the hearing examiner that the wildfire mitigation and forest management plans had been reviewed by Fire District 3 and DNR. DNR's comment letter, provided in September 2020, was from its assistant regional manager for Wildfire and Forest Protection, and expressed no concerns about increased wildfire risk from the project. The September 16, 2020 comment letter from Fire Chief Long on behalf of Fire District 3 endorsed the SEPA checklist's mitigation undertakings and requested that the County implement and enforce them. It observed that if section IV of the wildfire mitigation plan "is followed fully, this property would be slated to be dramatically improved rel[eva]nt to reducing the chances for wildfire to propagate through or from this property." AR at 4230.

Ms. Lindblad imposed the following fire danger-related conditions to the MDNS:

16. The Applicant shall follow recommendations from Klickitat County Public Works to provide adequate provision for access to the site. Roads serving the project shall meet AASHTO or Washington State Department of Transportation (WSDOT) standards for a fire truck.

17. All roads that are accessing the facility shall meet the Klickitat County Title 12 standards for a fire access road.

    a. The "Fire Access Road Standards" of Title 12 being within a 60 ft wide easement and shall have a running surface that is no less than 20 feet in width.

. . . .

18. All roads not accessing the facility shall be closed off via gate, bollard, etc. due to fire danger on roads that are not being brought up to the fire access road standard. Cross-Sections for the roads and cart paths are required to be submitted for review by Public Works.

. . . .

20. Due to fire danger of parking on vegetation during dry conditions, the parking lot is required to have a minimum 6" gravel surface if permitted from May to October. If outside the May to October window, the parking area will be required to have a total of 12" gravel surface, 6" of gravel is required for the project, but 12" is advised for muddy conditions during Spring.

. . . .

25. A vegetation management plan shall be created to help preserve the road as well as mitigate for fire dangers.

. . . .

27. The Applicant shall implement applicable measures as detailed in the Wildfire Mitigation Plan (Washington Forestry Consultants, Inc. June 2020) to reduce wildfire risk.

28. Burn ban restrictions shall be observed. Outdoor burning of any type is not allowed during burn ban within Klickitat County Burn

Ban Zone Three (3). When burn ban is in effect, warning signs shall be posted alerting guests of the ban.

29. The applicant shall also develop a firefighting plan with Klickitat County Fire District #3. The plan should include an assessment of the fire district's capabilities to respond to fire emergencies. The Department of Natural Resources should also be consulted as a potential responder.

30. Provide an evacuation plan in case of an emergency that anticipates the need to evacuate guests quickly.

31. Have fire extinguishers and other fire suppression equipment/emergency medical equipment such as an automated external defibrillator (AED) onsite and readily available for use.

. . . .

40. Structures, existing and proposed, shall comply with all applicable code requirements, including fire separation setbacks, as prescribed by the Washington State Building Code, RCW 19.27.

AR at 166-68.

KLPF and the Whites nevertheless contended in their SEPA appeal that the MDNS was not based on reasonably sufficient information to demonstrate prima facie compliance with SEPA, a failure they contend is demonstrated by conditions 29's and 30's provisions for *future* preparation of firefighting and evacuation plans. They also contend that reports prepared by their three experts, Ross Tilghman, Gary Norris, and Ron Scott, identify "significant reason to doubt the feasibility of mass evacuation during a wildfire." Opening Br. of Appellants at 38.

The Tilghman report was prepared in May 2021 by Mr. Tilghman, who describes himself as a transportation planning consultant with over 35 years of experience. The

declaration provided with his expert report states that he was asked by the appellants "to provide an assessment of the various traffic impact studies presented by DKS on behalf of Under Canvas, as well as an assessment of Klickitat County's independent review by Skillings and the county's MDNS." AR at 5484.

The Gary Norris report was prepared in January 2021 by Mr. Norris, a senior engineer and project manager for DN Traffic Consultants, Inc., who reports having more than 45 years' experience in the field of traffic engineering and safety. The declaration provided with his expert report states that he, too, was asked by the appellants "to provide an assessment of the various traffic impact studies presented by DKS on behalf of Under Canvas, as well as an assessment of Klickitat County's independent review by Skillings and the county's MDNS." AR at 5444.

The Ron Scott report is undated, but was provided with a declaration dated May 31, 2021. Mr. Scott describes himself as a "certified fire investigator with JSI Northwest, a fire origin and cause consulting firm." AR at 5527. Prior to working for JSI Northwest, Mr. Scott states he was a claims manager for ITT-Hanford and handled investigations into over 1,000 fires. His bio describes him as "conduct[ing] special projects in fire origin and cause, civil subrogation, fire scene forensic, [and] mechanical consulting in Commercial Property, Residence, Heavy Equipment, Trucks, Marine and Aircraft." AR at 3973.

27

Mr. Scott's report states that he read Washington Forestry Consultant's Wildfire Mitigation Plan and

> I agree with many of the proposed recommendations for reducing fire risk on the project site. However, *it is unclear* whether the recommendations in this report would reduce the risk of wildfire below current risk levels as stated in the revised SEPA checklist, particularly when considered in tandem with the large number of people who will be driving to and from the project site on a regular basis. The mitigation measures outlined in the Wildfire Mitigation Plan are sound. But the addition of more people and vehicles also increases the risk of fire. Whether the overall risk of wildfire will go up or down after development is *unclear*.

AR at 5530 (emphasis added). Mr. Scott also expressed the view that

> Given that the only access to the site is to the east along Oak Ridge Road, there is a high degree of risk that guests and others on site during a major fire event would be trapped. There is also a high degree of risk that in a major evacuation of all resort guests (potentially totaling in the hundreds), vehicles attempting to flee the project site would interfere with fire-fighting assets trying to reach the site on Oak Ridge Road. Ground-based fire-fighting assets trying to reach the site along Oak Ridge Road could increase the likelihood of guest entrapment due to conflicts. And with only a narrow dirt and gravel road to access the site, there is a high risk for a fire to escape and become uncontrolled.

AR at 5532. He acknowledged that the MDNS imposed conditions 29 and 30 but stated that in his opinion, "impacts on fire safety cannot be evaluated without these plans and assessments in place." AR at 5332. He testified that he had spoken with Chief Long of Fire District 3 and acknowledged that he "is highly qualified and has vast experience in wildfire protection and training others." AR at 5532.

At the SEPA hearing, KLPF and the Whites called as witnesses Mr. Tilghman and Mr. Norris, but not Mr. Scott. Mr. Tilghman testified that if 215 guests and 35 staff had to be evacuated from the project site on short notice and all at once, the estimated 125 departing vehicles could create an estimated 6,250-foot-long line of cars, and possible conflicts with emergency responders. He agreed that his testimony was based on an assumption that everyone at the fully-occupied site would be getting in their cars and driving out at one time. He acknowledged on cross-examination that in arriving at his opinion on the evacuation issue he had not spoken with anyone from Fire District 3 or the County. He testified that he had never prepared a formal evacuation plan. After the parties' lawyers had finished their questioning, the hearing examiner asked Mr. Tilghman if he considered himself an expert in the design of emergency evacuation plans, and he answered, "No, I don't make that claim." CP at 694. He testified that he was confident of his ability to evaluate the efficacy of an estimated 125 vehicles leaving the project site at one time.

Mr. Norris had not addressed the emergency evacuation scenario in his report other than to cite Mr. Tilghman's report as raising some "critical points to consider." AR at 5455. During his direct examination at the SEPA hearing, he indicated his continuing agreement that "there[ is] at least a good grounds for being concerned as to how vehicles will get out" in the event of an emergency. CP at 701. When cross-

examined, he testified that he, too, had never prepared evacuation plans and he did not consider himself an expert in evacuation plans. He testified that he did consider himself an expert in traffic flow, however. He agreed that on reaching Oak Ridge Road, persons leaving the project site could travel north or south, although he added that existing patterns of traffic flow would not support an assumption that equal numbers of vehicles would go each way.

Ms. Lindblad was called as a witness by KLPF and the Whites. She testified that she had been the County's SEPA responsible official since 2015. She answered questions about her SEPA review process and testified that in reviewing Under Canvas's applications she had looked at the wildfire management plan and related reports provided by Under Canvas. She testified that it was significant to her that DNR and Fire District 3 affirmed to the County that they had reviewed Under Canvas's submissions, had consulted directly with Under Canvas, and had no specific concerns, including with respect to their capacity to provide protection to the project site in the event of fire. During questioning about conditions 29 and 30, Ms. Lindblad testified that she had not asked Fire District 3 to comment on the feasibility of evacuation before issuing the MDNS and was satisfied with requiring that they review and approve firefighting and evacuation plans before Under Canvas begins operation. She testified that she did not require the evacuation plan *before* issuing the MDNS because the scope of the project

was dependent on the hearing examiner's decision on the conditional use and recreation park permits.

Fire Chief Long was called as a witness by Under Canvas. He testified that he had experience in developing firefighting and evacuation plans, and in his capacity as fire chief, he approved such plans. He affirmed that he and representatives of DNR had an early site visit with Under Canvas staff and testified in addition that "I believe we've done our due diligence to make sure that our comments as requested by the county, and our needs, have been addressed. Excuse me, not addressed, or at least outlined in written form." CP at 791. He affirmed that he had submitted two comment letters, one on September 16, 2020, and an earlier, undated letter. He affirmed that it remained his position, as stated in his September 2020 letter, that if fully implemented, section 4 of the wildfire mitigation plan would dramatically reduce chances for wildfire to propagate through or from the Under Canvas property.[5]

---

[5] KLPF and the Whites state in their opening brief that Chief Long "was . . . deemed to be without the skill, expertise, training and experience necessary to qualify as an expert on [fire evacuation] issues." Opening Br. of Appellants at 44 (citing CP at 791). A clearer explanation of that ruling is in order.

Presumably because of the limited time available for witness testimony at the SEPA hearing, one of the hearing examiner's pretrial rulings in a March 2021 order was that "[c]ross examination of expert witnesses will be allowed at the SEPA appeal hearing, so long as those expert witnesses testify live," but "[t]here will be no cross examination of any lay witnesses." AR at 5758. In disclosing their "live" witnesses shortly before the July 2021 hearings, both parties tended to identify only their retained experts as expert witnesses, and identified others as lay witnesses, even when such witnesses arguably had

Chief Long testified that his expectation for the firefighting and evacuation plans required by the MDNS was that they would be written plans, "specific towards the site, for the site, and the immediate area around," and that they would address staff training, drills, and coordination and communication with local response agencies. CP at 794.

Asked about how Fire District 3 would respond to a fire that started at the camp, Chief Long explained that Fire District 3 is a member of a three agency automatic response with the cities of White Salmon and Bingen, and because the Columbia River Gorge project would be located in DNR's dual protection area, DNR would also respond. He explained:

> [A] typical response, a reliable response would be for a wildfire in that particular area, no less than three wildland fire engines from this agency, no less than two from [the] city of Bingen, no less than one from [the] city of White Salmon.
>
> Probably at least two supervisors in the form of a chief, two water tenders, and so on. Currently in 2021 because of state funding opportunities due to wildfire goals of the Lands Commissioner, here's what you would receive

specialized knowledge as a result of education, training or experience. *See* AR at 5245-46, 5249-50.

At the SEPA hearing, after Under Canvas called and questioned Public Works Deputy Director Hunter, the appellants objected that they should be able to cross-examine him about any opinions expressed in his testimony. The hearing examiner's ruling then, and later with Chief Long, was that if a witness had been identified as a lay witness, the hearing examiner would not treat *opinions, offered in their live testimony*, as expert opinions. He did not rule that he would not consider expert opinions they had earlier offered in comment letters, reports or declarations. And he never ruled that Mr. Hunter or Chief Long lacked specialized knowledge. *See* CP at 790-91.

The appellants did not assign error to the hearing examiner's ruling.

32

> from DNR on that property. If a fire is ensued within minutes, five wildland structural—or excuse me. Five wildland type five-six brush rigs staff during the summer months would be immediately dispatched, plus one from the Forest Service if available in the area. One fixed-wing or rotary-wing aircraft, one dozer, and at least one supervisor, as of today.

CP at 795.

On the issue of prima facie compliance, the hearing examiner found that "[t]he SEPA responsible official had sufficient facts and information regarding environmental impacts to wildfire at the time the MDNS was issued in this matter." CP at 72.

Law and its application to the facts

If a governmental body makes a threshold determination of "no significant impact" under SEPA, "it must then demonstrate that environmental factors were considered in a manner sufficient to be a prima facie compliance with the procedural dictates of SEPA." *Lassila v. City of Wenatchee*, 89 Wn.2d 804, 814, 576 P.2d 54 (1978). And before a court may uphold a determination of "no significant impact," "it must be presented with a record sufficient to demonstrate that actual consideration was given to the environmental impact of the proposed action or recommendation." *Id.* Clearly relevant to this issue are the facts that Under Canvas submitted a fully-completed environmental checklist with supporting technical analyses, and that the County solicited comments, reviewed them, and requested and obtained substantial additional information. *Cf. Boehm v. City of Vancouver*, 111 Wn. App. 711, 719, 47 P.3d 137 (2002) (applicant's

submission of a detailed environmental checklist and city's preparation of an environmental review report supported prima facie compliance).

In *Boehm*, a case relied on by KLPF and the Whites, the appellants argued that despite the applicant's and the city's seeming compliance with chapter 43.21C RCW and applicable regulations, challengers could establish a lack of prima facie compliance by pointing to a site-specific impact of the project that had not been considered—in *Boehm*, it was an alleged failure to consider the alleged "cumulative impact" of the project. This court did not disagree. But this court held that where the record reflects overall compliance with SEPA procedures, a challenge to prima facie compliance that is based on failure to consider a particular alleged site-specific impact must demonstrate that the alleged impact is not speculative, but will actually occur. 111 Wn. App. at 719-20.[6] Because the appellants in *Boehm* offered only speculation, not evidence, of cumulative impact, they failed to establish that consideration of the impact had been required.

Here, there was overall compliance with SEPA procedure. KLPF and the Whites contend, however, that there was a failure to consider a site-specific impact: the alleged infeasibility of mass evacuation during a wildfire. For several reasons, we disagree.

---

[6] The court further held that a "cumulative" impact within the meaning of, e.g., WAC 197-11-060(4), is an impact from foreseeable *future* development on which the present project depends. *Boehm*, 111 Wn. App. at 720-21.

*There is no support for the premise that evacuation planning must account for the simultaneous exodus of every person served by Oak Ridge Road.* Among exhibits offered by KLPF and the Whites were accounts of other wildfires in Klickitat and Skamania counties.[7] Almost all, if not all, of the evacuation or "get set" orders described were issued a day or multiple days after fire was reported and fire suppression efforts were underway. None involved a situation so emergent that residents were fleeing at the same time the first firefighters were attempting to reach the fire scene. Evacuees interviewed were property owners, who would understandably wait for an evacuation order before making the decision to leave their home, especially not knowing when or whether they might return. Under Canvas guests would have different motivations on receiving word of a merely potential threat from a fire in the area. With their backpacks or suitcases at hand and far less reason to stay, campsite guests might leave early (and might even be encouraged by staff to leave), to avoid deteriorating air quality and traffic.

As support for the asserted need to demonstrate the feasibility of a simultaneous exodus, KLPF and the Whites cite this court's decision in *Lanzce G. Douglass, Inc.*, which did turn on emergency evacuation planning, but that decision is distinguishable in important respects. In *Lanzce G. Douglass*, a city hearing examiner reversed a MDNS based on the lack of adequate egress from an area in the event of a firestorm event

---

[7] *See, e.g.*, AR at 1831-33 (Dry Creek Fire); AR at 1826-28, 1856-57 (Mile Marker 119 Fire); AR at 1850-51 (Eagle Creek Fire).

requiring evacuation. The superior court reversed the hearing examiner, and this court reversed the superior court. *Lanzce G. Douglass*, like an earlier unpublished decision of this court in *Ponderosa Neighborhood Association v. Spokane County*, noted at 141 Wn. App. 1031, 2007 WL 3349121,[8] dealt with county review of subdivision development in the Ponderosa area of Spokane County. The wildfire hazards in the Ponderosa area had led to a significant firestorm in October 1991 that destroyed 14 homes and threatened another 105. *Lanzce G. Douglass*, 154 Wn. App. at 412. Following the 1991 fire, Spokane County began to require development projects in the Ponderosa area to address egress by residents during wildfires. *Id.*

In *Ponderosa Neighborhood Association*, this court affirmed the county hearing examiner's *approval* of a 100-lot preliminary plat application subject to conditions, following the association's appeal of the county's issuance of a DNS. The association challenged the hearing examiner's findings (among others) that the neighborhood could reasonably be evacuated in the event of a fire and that the applicant's evacuation analysis had been accepted by fire department officials and the county's engineering department. 2007 WL 3349121, at *2. This court rejected the challenge, noting that among evidence presented was evidence that the fire district did not envision evacuating the entire area,

---

[8] As an unpublished decision, it has no precedential value, is not binding on any court, and is cited only for its persuasive value. *See* GR 14.1.

and there was no actual requirement that the neighborhood be evacuated within a 30-minute time period. *Id.* at \*5-6.

By contrast, in *Lanzce G. Douglass*, the same hearing examiner who approved the preliminary plat we affirmed in *Ponderosa Neighborhood Association* <u>reversed</u> a MDNS that the city of Spokane Valley issued for an adjacent 100-lot development. 154 Wn. App. at 412. In the latter case, unlike the earlier case, the local fire district and county sheriff expressed concerns about the feasibility of evacuation, and the hearing examiner found that the city's planning division had not considered their concerns. *Id*. at 418. In addition, Douglass's traffic expert based his evacuation model on evacuation of only the then-existing 1,281 homes in the Ponderosa area, without considering the additional traffic generated by the proposed development or other projects that had been approved. *Id.* at 420, 423. Moreover, when even that analysis revealed that some intersections would experience congestion, the expert applied an assumption that actual notice of evacuation would be door-to-door, staggering the exodus. *Id.* at 420-21.

In short, *Lanzce G. Douglass* involved an evaluation of egress that was mandated based on historical experience in the Ponderosa area and a resulting county policy; that involved residents, most of whom would likely leave only upon the issuance of an evacuation order; and that involved a substantially higher number of vehicles served by only two access sites, with one intersection that experienced congestion problems during

the 1991 firestorm. *Id.* at 413. Perhaps most importantly, it involved safety concerns that had been expressed by the local fire district and county sheriff and were not considered. And in both that case and *Ponderosa Neighborhood Association*, we gave substantial deference to the factual determinations of the hearing examiner. *Id.* at 415; *Ponderosa*, 2007 WL 3349121, at \*8.

 *The appellants' experts lack relevant experience.* Neither Mr. Tilghman nor Mr. Norris have ever prepared a wildfire evacuation plan and neither claimed any expertise on such evacuations. They merely opined on the scenario of 125 vehicles leaving the campsite at once, assuming that most would travel southbound on Oak Ridge Road, and assuming the possibility of visibility-reducing smoke and road blockages by fallen trees. Neither considered the possibility that guests who might have taken a right turn on Oak Ridge Road under other circumstances might turn left in an evacuation, especially given that northbound, BZ Glenwood Highway is only 2.2 miles away and after .3 miles of gravel road, Oak Ridge Road northbound is paved. Neither considered the possibility that if Fire Department 3 would be responding from the south, an evacuation plan might *require* guests to take the northern route until needed fire-fighting equipment had arrived at the scene. There was no discussion of the fact that while a simultaneous evacuation would produce a long line of vehicles, at the posted speed of 25 miles per hour (1 mile

every 2.4 minutes), the 4.3 miles to SR 141 could be traveled in 10.32 minutes, and the 2.2 miles to BZ Glenwood Highway could be traveled in 5.28 minutes.

Mr. Scott is a certified fire investigator with an insurance claim background and expertise in fire source and causation. But nothing in his report or his bio reflected any experience in wildfire suppression or evacuation planning. And he did not testify at the SEPA hearing.

*Fire Department 3 and DNR did not express concern with the MDNS.* Unlike the appellants' retained experts (with no wildfire suppression or evacuation expertise), Fire Department 3 and DNR, which we have observed elsewhere is "'Washington's largest 'on call' wildland fire department,'"[9] did not express concern about the MDNS or its requirement that Under Canvas *later* prepare and submit a firefighting plan and a site-specific evacuation plan. While KLPF and the Whites criticize the County for requiring the production of these plans after rather than before issuance of a MDNS, they cite no legal authority that would require production of such plans before a MDNS is issued. WAC 197-11-330(2)(b) gives the responsible official discretion to determine whether "[e]nvironmental analysis would be more useful or appropriate in the future in which case, the agency shall commit to timely, subsequent environmental review."

---

[9] *Schulz v. State*, 12 Wn. App. 2d 729, 731, 459 P.3d 1090 (2020) (noting that "[i]n its firefighting role, [DNR] is charged with protecting over 13 million acres of private and public forestlands."

There are on-site elements of an emergency evacuation plan that Ms. Lindblad could reasonably determine would be better formulated after the hearing examiner's CUP determination but before issuance of building and occupancy permits: elements such as responsibility for communication with emergency responders, assembling and accounting for guests and staff, and shutting down or securing utilities and equipment. While the appellants discount these elements, Ms. Lindblad's determination is entitled to deference.

*Under Canvas's experts disagree with KLPF's and the Whites' experts about the adequacy of Oak Ridge Road.* Finally, in their reports, rebuttal statements and/or testimony responding to the opinions expressed by KLPF's and the Whites' experts, two DKS traffic engineers and Galen Wright, Under Canvas's forestry expert, expressed and later stood by their opinions that as conditioned by the MDNS, Oak Ridge Road would be adequate in the event of a fire. *See, e.g.*, AR at 252-53 (Wildfire Mitigation Plan: "The road system will support fire trucks and support personnel year round."); AR at 5351-54 (Wright rebuttal: Oak Ridge road provides egress in two directions; implementation of the Wildfire Mitigation Plan will reduce chances of fire propagating from or through the project site); CP at 817 (Dr. Brown: roads will meet the County's 20-foot width required for fire access); AR at 325, 331 (DKS/Flisakowski traffic study: "The available roadway width can safely accommodate two vehicles (passenger vehicles, large commercial trucks and school buses) passing (one in each direction)," "The addition of project trips would

40

not impede existing traffic operations on Oak Ridge Road"). We leave credibility questions to the hearing examiner, as the trier of fact. *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 618, 829 P.2d 217 (1992).

The hearing examiner's finding of prima facie compliance with SEPA is entitled to deference. The appellants' experts' only partially relevant experience and unsupported assumptions, when considered alongside countervailing evidence that the hearing examiner was entitled to credit, fail to demonstrate a real, as opposed to speculative, site-specific impact.

B.      *Adequacy of MDNS Conditions 29 and 30 Under the KCC*

KLPF and the Whites next contend that MDNS conditions 29 and 30 violate a specificity requirement imposed by KCC 20.12.040.E.3. The provision states that when the County reviews an applicant's changed or clarified proposal,

> [t]he applicant's proposed mitigation measures (clarifications, changes or conditions) must be in writing and must be specific. For example, proposals to "control noise" or "prevent stormwater runoff" are inadequate, whereas proposals to 'muffle machinery to X decibel' or construct 200-foot stormwater retention pond at Y location' are adequate.

KCC 20.12.040.E.3.[10]

---

[10] Under Canvas contends that this is the first time KLPF and the Whites have challenged conditions 29 and 30, which is incorrect. While the superior court did not resolve their challenges, KLPF and the Whites challenged these conditions in their amended notice of appeal to the hearing examiner.

KCC 20.12.040 codifies local SEPA procedures associated with a responsible official's issuance of a MDNS, which are regulated at the state level by WAC 197-11-350. WAC 197-11-350's purpose is to "allow clarifications or changes to a proposal prior to making the threshold determination" and contemplates development of such measures by the responsible official as well as the applicant's own proposal of mitigation measures. WAC 197-11-350(2), (3).

By its plain language, subsection E.3.'s specificity requirement applies to only mitigation measures proposed by the *applicant*. It does not apply to conditions arrived at by the responsible official in issuing the MDNS. Conditions 29 and 30 of the MDNS, which were developed by Ms. Lindblad, therefore cannot violate KCC 20.12.040.E.3. We also note that Ms. Lindblad did not merely require Under Canvas to "develop a firefighting plan and evacuation plan"; her conditions dictate particulars on the nature of the plans and, in the case of the evacuation plan, specific content and third party participation.

C.      *Compliance with County Permit Criteria*

Finally, KLPF and the Whites point to provisions of the Klickitat County Code that require approval of conditional use and recreation park permits to be supported by three findings that were not made by the hearing examiner. They posit that the findings were not made because the evidence would not support them. The superior court rejected

42

this challenge to evidence sufficiency by treating it as a "fail[ure] to follow a prescribed process," which is a basis for judicial review under LUPA, "unless the error was harmless." RCW 36.70C.130(1)(a). The superior court concluded that the hearing examiner's failure to make the three findings was harmless because evidence *did* support the findings, had they been made. This approach does not address the substance of the appellants' challenge, however, which was not based on RCW 36.70C.130(1)(a).

Addressing the challenge as presented, the first two missing findings are addressed by KCC 19.53.130A, which provides in relevant part that

> A. Prior to application approval of a conditional use, . . . the . . . board of commissioners . . . shall make the following findings:
> . . . .
> 3. That the property is suitable for the proposed use . . . ;
> 4. That the public facilities and services to serve the use are adequate for the proposed use.

KLPF and the Whites argue that their experts' testimony challenging the feasibility of a mass evacuation during a wildfire explains why the hearing examiner was unable to make these required findings that the property is suitable for the proposed use and the public facilities and services are adequate. For reasons already discussed, we disagree; the appellants' evidence supports only speculation.

Nevertheless, the remedy is not for this court to make factual findings. Because the hearing examiner's approval of the permit suggests that it overlooked making the required findings, the remedy is to remand for their entry, if intended, by the hearing

43

examiner, and any supporting findings addressing the evidentiary conflict. *See State v. Souza*, 60 Wn. App. 534, 540-42, 805 P.2d 237 (1991) (choosing remand over other remedies where missing findings were "more likely" due to error than evidentiary insufficiency).

The third finding alleged to be missing is addressed by KCC 22.08.110, which prohibits a land use officer from issuing a recreation park permit in any area "found unsuitable for such development because of . . . public access or other features that may be harmful to the public health, safety and general welfare." The appellants offered only speculation, so the fact that the hearing examiner did not find Under Canvas's land "unsuitable" cannot be clear error. And no clear error is demonstrated by his failure to make a finding one way or the other, because "[t]he trier of fact is not required to enter negative findings or to find that a certain fact has not been established." *Hering v. Dep't of Motor Vehicles*, 13 Wn. App. 190, 192, 534 P.2d 143 (1975).

We will remand with directions to the hearing examiner to make findings under KCC 19.53.130, as appropriate.

III.    TRAFFIC-RELATED IMPACTS

KLPF and the Whites contend that issuance of the MDNS failed to comply with Klickitat County's traffic-related permitting requirements because the traffic impact studies submitted by Under Canvas allegedly (1) failed to document deficiencies in the

design, construction, and current condition of Oak Ridge Road, (2) failed to adequately

describe "pedestrian needs and overall traffic operations and circulation," and (3) failed

to assess improvements needed to mitigate the impact of the development and any

adverse effects development-related traffic might have on the transportation network.

Opening Br. of Appellants at 54-57. They also they contend that key findings supporting

the MDNS as it relates to traffic-safety impacts are clearly erroneous or not supported by

substantial evidence. *Id.* at 58-59. They repeatedly discuss these two issues in the same

breath, and tend to conflate them. They are different issues, however, and after setting

forth evidence relevant to both, we address the two issues separately.

Relevant evidence

Chapter 12.30 of the KCC addresses County road standards, and KCC

12.30.020.10 provides that any land use application that will create more than 40 average

daily trips shall submit a transportation impact study.[11] The provision states that the

impact study "will be used as the basis of determining traffic impact fees, of assessing

developer contributions to roadway improvements, and determining the appropriate

roadway standards improvements associated with a development permit." KCC

12.30.020.10. The provision states that "[t]he traffic study should include the following

documentation," and identifies 10 categories of information. *Id.* KLPF and the Whites

---

[11] A copy of Title 12 is included in the administrative record beginning at AR 1547, which is included in volume II.

contend that the traffic impact studies prepared by DKS failed to address the following

matters that the Code says "should" be included:

B.  Description of the existing roadway conditions such as traffic volumes, transit accessibility, accident history, roadway geometrics, pedestrian needs and overall traffic operations and circulation.

C.  Identification of traffic congestion, accident areas and other deficiencies of the transportation system in the study area.

. . . .

G. Development and evaluation of potential improvement measures needed to mitigate the impact of the development to the level defined by local/state policies.

H. Development and evaluation of potential improvement measures needed to mitigate the impact of the development to the level defined by accepted engineering practices.

I. Identify transportation improvements that achieve the needed level of site access and mitigate any adverse effects[ ]the development related traffic might have on the transportation network.  Sufficient detail should be included so the reviewing agencies, Planning Commission, Board of County Commissioners and the public will be able to follow the methodology of the analysis and associated finding and recommendations.

KCC 12.30.020.10.B.-I.

As recounted above, DKS's first traffic study was submitted to the County in June

2020; it was revised in October 2020 in response to detailed staff comments; County staff

engaged Skillings, Inc. to prepare a technical review of the revised study; and DKS's

final traffic impact study, which addressed Skillings' comments, was submitted in

December 2020.  It was available to Ms. Lindblad in preparing the MDNS.  The final

traffic impact study contained the map we included above and states in relevant part:

The major roadways in the study area are SR 141, Oak Ridge Road and BZ Glenwood Highway. A map of the study area and site location is shown in Figure 1.

[Map omitted.]

A field visit to the study area was conducted on Saturday, May 30, 2020 to inventory the facilities and observe transportation conditions. The Klickitat County Regional Transportation Plan provides rural functional classifications for the key roadway system. SR 141 is a State Route and classified as a local rural principal arterial. It provides two paved travel lanes (one in each direction) with a 55 mile per hour posted speed limit.

BZ Glenwood Highway is classified as a rural major collector and provides two paved travel lanes (one in each direction) with a 50 mile per hour posted speed. There are no sidewalks, bike lanes or transit facilities in the study area.

Oak Ridge Road is classified as a local facility and provides two travel lanes (one in each direction) with a 35 mile per hour posted speed near SR 141 and a 25 mile per hour posted speed to the north. Oak Ridge Road has a paved surface on the south end near SR 141 and the north end near BZ Highway. There is a gravel surface for the middle segment near the project site. The available roadway width can safely accommodate two vehicles (passenger vehicles, large commercial trucks and school buses) passing (one in each direction).

Due to topography, the roadway has several segments with steep grades and sharp curves which may require reduced vehicle travel speeds. Oak Ridge Road is also used by the community for walking, jogging and biking recreational trips. During the field visit, several pedestrians were observed walking on the shoulder of the road with adequate room for vehicles to safely pass.

. . . . [Table omitted.]

The traffic impact study focused the operations analysis on three study intersection locations as requested by the County. The study intersection locations are shown on Figure 1.

- SR 141/Oak Ridge Road
- SR 141/BZ Glenwood Highway/Sprinkle Lane

• Oak Ridge Road/BZ Glenwood Highway

The SR 141/Oak Ridge Road intersection includes three approach legs, westbound Oak Ridge Road is at a sharp angle to SR 141. The westbound Oakridge Road approach is stop controlled, while SR 141 is uncontrolled in both directions. Eastbound Husum Street intersects SR 141 approximately 100-feet south of Oak Ridge Road (measured centerline to centerline). A bridge over the White Salmon River is just north of the intersection.

[Photograph omitted.]

The SR 141/BZ Glenwood Highway intersection has four approaches. The westbound BZ Highway and eastbound Sprinkle Lane approaches are stop controlled, while SR 141 is uncontrolled.

The Oak Ridge Road/BZ Glenwood Highway intersection has three approaches. The northbound Oakridge Road approach is stop controlled, while BZ Glenwood Highway is uncontrolled.

The available collision data from WSDOT over the last five years (2015 through 2019) was reviewed for Oak Ridge Road between SR 141 and the BZ Glenwood Highway and at the three study intersections. The collision data indicated there were no reported crashes on Oak Ridge Road. There was one reported collision at the SR 141/Oak Ridge Road intersection with no injury due to a driver following too closely. There was one reported collision at the SR 141/BZ Glenwood Highway/Sprinkle Lane with a minor injury due to a parked vehicle pulling into traffic. The detailed collision data is included in the Appendix.

TRAFFIC VOLUMES

Turn movement counts were collected at the study intersections on Friday, October 9, 2020 during the PM peak period (4:00 to 6:00 PM) based on Klickitat County staff requirements. The PM peak hour counts showed SR 141 south of Oak Ridge Road served 387 vehicles and Oak Ridge Road east of SR 141 served 34 vehicles. Pedestrian volumes during the PM peak hour were observed to be the highest at the SR 141/Oak Ridge Road intersection with 17 pedestrians. The other study intersections had 6 pedestrians or less. No cyclists were observed at any of the study intersections during the peak period. The traffic data is included in the Appendix. The October 2020 intersection count data was collected during the Washington State Stay Home, Stay Healthy order. Compared to the

48

June 2019 count data for Oak Ridge Road, October 2020 data was approximately 50 to 100 percent higher which confirmed use of the October 2020 data for the intersection analysis was appropriate.

For this analysis, the intersection turn movement count data collected in early-October was adjusted by applying a 17 percent increase to represent peak seasonal conditions that would occur in late July. An additional one percent per year growth rate was also applied to the year 2020 volumes to estimate 2025 future volumes at the study intersections, the year when the proposed project is expected to be fully built.

Klickitat County provided roadway data collected in June 2019 at three locations along Oak Ridge Road: between SR 141 and Rattlesnake Road, north of Rattlesnake Road and south of BZ Glenwood Highway. Roadway counts were provided for multiple consecutive weekdays for 12-hour count periods (midnight to noon and noon to midnight). The data is included in the Appendix.

Count data provided by Klickitat County included a vehicle classification survey of Oak Ridge Road. The average heavy vehicle percentages surveyed were 16 percent for the segment between SR 141 and Rattlesnake Road, 23 percent for the segment north of Rattlesnake Road and 12 percent for the segment just south of BZ Glenwood Highway. Heavy vehicles on Oak Ridge Road are primarily logging and agricultural trucks.

. . . .

SITE ACCESS ANALYSIS

An evaluation was conducted to determine if the proposed site access on Oak Ridge Road would impede the flow of traffic. The evaluation was based on operations at the site access intersection, available sight distance at the site access and an assessment of conditions Oak Ridge Road.

The estimated new trips at the site access would be low, with 48 vehicles during the AM peak hour and 23 vehicles during the PM peak hour (see Table 4). The site access/Oak Ridge Road intersection with project trips added would operate with low vehicle delays and level of service A conditions during the Friday PM peak hour [sic] (shown in Table 6). The addition of project trips would not impede existing traffic operations on Oak Ridge Road.

The site access should meet stopping sight distance requirements for Klickitat County.  Based on 25 miles per hour, a minimum of 155-feet of stopping sight distance should be provided from the driveway.  Stopping sight distance provides sufficient distance for drivers to anticipate and avoid collisions.  This may require a major road vehicle to stop or slow to accommodate the maneuver by a minor road vehicle.  The posted 25 mile per hour speed limit was used to determine the requirements.  The site access is located along a long curve on Oak Ridge Road and drivers would likely be travelling at a speed lower than 25 miles per hour with reduced sight distance requirements.  This analysis represents a conservative assessment.

Sight distance at the access to the site was assessed during the May 28, 2020 field visit.  Photos from the site visit are shown in Figure 3.

[Photographs omitted.]

The available sight distance looking north was observed to be approximately 150 feet, limited by trees on both sides of the road and the horizontal curve on Oak Ridge Road.  The available sight distance looking south was observed to be approximately 130 feet, limited by a soil berm, trees on the west side of the road and the horizontal curve on Oak Ridge Road.

The available sight distance should be increased with appropriate tree trimming/removal and soil grading along approximately 130-feet of the west side of Oak Ridge Road to meet the requirements.  The project should realign the site driveway approach within the 60-foot easement to reduce or remove the existing skew to meet the County standards and improve driver safety.  Both the project driveway and Oak Ridge Road are located within a 60-foot wide easement.  Improvements to increase sight distance from the site driveway should be implemented within these easements to avoid potential impacts to private property.

AR at 324-32 (footnotes omitted).

In issuing the MDNS, Ms. Lindblad imposed traffic-related conditions that addressed, among other issues, DKS's expressions of concern about the need for drivers

to reduce speed on steep grades and sharp curves, and the need to ensure an adequate

sight distance for the access off Oak Ridge Road to the Under Canvas property. She

imposed the following traffic-related conditions:

14. A commercial road approach permit and construction is required at the entrance to the proposed project.

15. No event parking will be allowed on Oak Ridge Road.

16. The Applicant shall follow recommendations from Klickitat County Public Works to provide adequate provision for access to the site. Roads serving the project shall meet AASHTO or Washington State Department of Transportation (WSDOT) standards for a fire truck.

17. All roads that are accessing the facility shall meet the Klickitat County Title 12 standards for a fire access road.

   a. The "Fire Access Road Standards" of Title 12 being within a 60 ft wide easement and shall have a running surface that is no less than 20 feet in width.

   b. The Fire Access Road shall be constructed with a minimum of 0.75 ft compacted thickness of "Base Course" (1-1/4" minus crushed rock) or "Pit Run" with 0.25 ft compacted thickness of "Top Course" (5/8" minus crushed rock) placed as the wearing surface.

   c. If roads are modified or constructed, maximum fill slopes and ditch in-slopes shall not exceed 2 ft horizontal to 1 ft vertical (2:1). Slopes steeper than 2:1 are not allowed.

18. All roads not accessing the facility shall be closed off via gate, bollard, etc. due to fire danger on roads that are not being brought up to the fire access road standard. Cross Sections for the roads and cart paths are required to be submitted for review by Public Works.

. . . .

22. Specific measures to reduce traffic impacts during the construction process shall be used. Measures will include signage, notifying local residents of the work, and compliance with any requirements of the Klickitat County Public Works and/or WSDOT.

23.  Oak Ridge Road is on the County's safety plan to upgrade the current signage. The paved sections of the road are scheduled to be upgraded. The gravel section of Oak Ridge Road is not scheduled to have the existing signage upgraded to meet the current Manual on Uniform Traffic Control Devices (MUTCD). The gravel section of Oak Ridge Road was left out due to low traffic volumes. According to the traffic impact analysis, the Proposal will generate 210 ADT through the gravel section of Oak Ridge Road. Since the proposal will increase the traffic on the gravel section of Oak Ridge Road, the Applicant is required to have a licensed engineer in the State of Washington who specializes in traffic engineering prepare a permanent signage plan related to curve and other warning signs for the gravel section of Oak Ridge Road. The plan shall be submitted and approved by Public Works prior to issuance of building permits.

24.  The Applicant shall apply for and receive a work within the right-of-way permit from Public Works to install new signs per the approved signage plan. The signs shall be installed prior to the applicant receiving an operational permit for the recreation park.

25.  A vegetation management plan shall be created to help preserve the road as well as mitigate for fire dangers.

AR at 166-67.

Following issuance of the MDNS, KLPF and the Whites engaged Mr. Tilghman and Mr. Norris to assess the DKS traffic impact studies and Skillings' independent review. KLPF and the Whites list the deficiencies identified by their experts as Oak Ridge Road "often [being] less than 20 feet wide, that there are significant sightline deficiencies around sharp curves, that the roadway is washboarded and potholes are a frequent problem, that there are steep drop-offs that do not meet the county's requirements for side slopes, and that there are deficiencies relating to vertical and

horizontal alignment." Opening Br. of Appellants at 54-55. KLPF and the Whites called Mr. Tilghman and Mr. Norris as witnesses at the SEPA hearing and they testified to the impacts they perceived as inadequately documented and addressed by the MDNS. Notably, Mr. Tilghman, who believed the MDNS condition requiring a 20-foot wide road applied only to the easement off Oak Ridge Road, was asked by Under Canvas's counsel if widening the entire gravel section of Oak Ridge Road to 20 feet would address his concern and he answered, "That would be a step in the right direction." CP at 687.

Appellant Dennis White also testified as a witness for the appellants, expressing his view that the unpaved section of Oak Ridge Road running south and north of the easement entrance to the project site "poses the greatest threat to traffic safety." CP at 660. He testified that he and his wife had used a 20-foot piece of ribbon to identify stretches of that section of the road that were less than 20 feet wide and determined that approximately 2,000 feet were less than 20 feet in width.

Mr. Hunter testified at the SEPA hearing that the County's public works department works with a project applicant or their traffic engineer to "condition what the traffic impact analysis should include," and that it is a "back and forth process." CP at 782. He testified that DKS's traffic impact studies complied with what his department requires under the KCC.

In Mr. Hunter's view, Oak Ridge Road and its intersections have the capacity to handle the additional traffic that would be generated by the Columbia River Gorge project. He observed that the County's consistent standard for roads was 20 feet, "whether people like it or not," and for projects on low volume roads, which is what is involved here, existing curvature was considered acceptable unless there was an accident history related to problems with road geometry, which there was not in this case. CP at 785. Where a history of horizontal curvature-related accidents is absent, he testified, it is sufficient to install signage as appropriate to warn of impending sharp curves and the need to reduce speed. A requirement for such signage is a condition of the MDNS.

As for the stretches of less than 20-foot wide roadway, Mr. Hunter testified that he was confident of his department's identification of the approximately 260 feet of gravel roadway on Oak Ridge Road that was less than 20 feet wide because "we've checked a couple of different times." CP at 786. Asked about his expectation that Under Canvas would do the required widening of the road to 20 feet, he answered, "It'll get done or we won't sign off on the project." CP at 787. He testified that the widening work would be categorized as a 2R, or minor widening project, which the County did not require to meet construction standards applied to new roads.

54

Mr. Hunter affirmed that logging trucks and agricultural vehicles use Oak Ridge Road, although the area was experiencing reduced logging and logging-related traffic. He testified that the County had no data showing truck-vehicle accidents.

Under Canvas also called as witnesses two traffic engineers who had participated in preparing DKS's traffic impact studies. Dr. Lacy Brown testified that "the amount of traffic that will be on this roadway, even with the project[,] is still a very low volume of traffic. And the opportunities for conflicts between vehicles is still incredibly low for this type of roadway." CP at 802. She testified that Mr. Tilghman and Mr. Norris had not provided any scientific or engineering evidence to support their conclusions that the project would have significant impacts on safety. Asked on cross-examination whether the DKS studies should have identified adequate shoulders as a pedestrian need, she responded:

> In a rural facility like this, the roadways are not designed with sidewalks or wide shoulders, or bicycle lanes. It's out of context for the type of roadway and the type of user that are provided. And the development as proposed would not be increasing the pedestrian or bicycle traffic in a significant way.

CP at 819.

Reah Flisakowski testified that she was the lead author of the DKS traffic impact studies. She affirmed Dr. Brown's testimony that the Columbia River Gorge project was not expected to generate bicycle or pedestrian use, explaining that Under Canvas

operations do not offer cycling as a component of a stay and do not generate walking or

biking trips.

The hearing examiner made a number of findings touching on traffic issues.

Those that are challenged include the following findings in the permitting decision:[12]

> 20.3.4 . . . The project will be adequately served by existing roads, Group B
> or A water and proposed on-site sewage system.
>
> . . . .
>
> 20.4.4  All project roads will meet Klickitat County Code Title 12
> Transportation Standards, including and not limited to Fire Access road
> standards. . . .
>
> . . . .
>
> 20.12.9.1  . . . The project site will be accessed from Oak Ridge Road and
> existing improved county roadway.  Oak Ridge is a mixed [sic] of paved
> and gravel road designed with ample site [sic] lines and widths to provide
> for safe and adequate access for project traffic.  Approximately 130 feet of
> the west side of Oak Ridge Road would be graded to improve site access.
> The project would realign the driveway approach within the 60-foot
> easement to reduce or remove the existing skew and improve driver safety.
> Improvements to increase sight distance from the site driveway would be
> implemented within these easements to avoid potential impacts on private
> property.  There are approximately 1.5 miles of gravel/native surface road
> within the project area.  Sixty percent of this (0.9 mile) is the main road, the
> remainder is the secondary logging roads.  Proposed internal site roads will
> conform to County Title 12 Transportation standards and will be sited
> where existing logging roads are located (to the extent practicable) to
> minimize clearing and new disturbance.

---

[12] *See* Opening Br. of Appellants at 58-59 for the findings that are addressed by
argument.  We decline to review findings to which error is nominally assigned but which
are not addressed by argument.  RAP 10.3(a)(6); *Cowiche Canyon Conservancy v.
Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (a finding that is assigned as error but
that is not addressed by argument is waived).

. . . .

20.16.1.8  The Klickitat County Department of Public Works stated that the Project shall be designed and constructed in conformance with the County's Title 12 Transportation Standards, including the design guidelines for the American Association of State Highway and Transportation Officials (AASHTO) and the Washington State Department of Transportation (WSDOT).

CP at 33-45.

Findings in the SEPA decision that are challenged include findings 21.3.4 and 21.15, which are identical to findings 20.3.4 and 20.12.9.1 set forth above; also challenged are the following findings:

29.1  The SEPA responsible official had sufficient facts and information regarding environmental impacts to traffic at the time the MDNS was issued in this matter.

29.2  . . . The Hearing Examiner finds that environmental factors related to traffic were adequately considered in a manner sufficient to establish prima facie compliance with the State Environmental Protection Act.  There was sufficient information provided to the SEPA responsible official to evaluate the proposal for environmental impacts related to traffic.

29.3  There are no probable significant environmental impacts related to traffic caused by this proposal.  In this respect, the Hearing Examiner finds those opinions of expert witnesses Reah Flisakowski, Lacy Brown, Liza Bornasal, Patrick Skillings, and comments and testimony from Jeff Hunter, Klickitat County Public Works Deputy Director, to be more convincing than those of Gary Norris and Ross Tilghman.

29.4  The Hearing Examiner finds that all environmental impacts relating to traffic are adequately mitigated through the conditions set forth in the MDNS.

29.5  The SEPA responsible official's decision regarding environmental impacts and mitigation measures, related to traffic, was not clearly

erroneous, and was based upon a review of the record presented to the responsible official.

29.6  There are no probable significant environmental impacts related to traffic.

CP at 71.

<u>Law and its application to the facts</u>

A.      *Alleged Failure to Comply with Klickitat County's Traffic-related Permitting Requirements*

KLPF and the Whites argue that Under Canvas's traffic impact studies failed to address criteria "required" by KCC 12.30.020.10, but that provision speaks of documentation that "should" be included in the study, and only the words "must" and "shall" are defined by KCC 1.04.010.G as being mandatory.  It is the County's position that if it intended to require a traffic impact study to include all of the criteria listed in KCC 12.30.020.10, it would have drafted the section using the word "must" or "shall" rather than "should."  The meaning of "should" is arguably unambiguous given the Code's definition of only "shall" and "must" as mandatory, but if it is ambiguous, we defer to the County's interpretation.  *Durland v. San Juan County*, 174 Wn. App. 1, 20, 298 P.3d 757 (2012) (citing *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 716, 153 P.3d 846 (2007); *Citizens For A Safe Neigh. v. City of Seattle*, 67 Wn. App. 436, 440, 836 P.2d 235 (1992)).

KLPF and the Whites provide no legal authority or reasoned argument that traffic information KCC 12.30.020.10 says "should" be documented by an applicant is information suggesting a "probable significant, adverse environmental impact" for SEPA purposes. The stated purpose of the KCC's roadway design control provision is to document information the County can use in making discretionary decisions about conditions it will impose on approval:

> A Transportation Impact Study (TIS) is an important tool used to determine the impact of a proposed land development project, and to identify the need for any improvements to a transportation system to reduce congestion, maintain and improve safety, and provide site access and impact mitigation associated with the project. *TIS reports will be used as the basis of determining traffic impact fees, of assessing developer contributions to roadway improvements, and determining the appropriate roadway standards improvements associated with a development permit.*

KCC 12.30.020.10 (emphasis added).

An applicant's failure to fully comply with KCC 12.30.020.10 would provide a basis for the County to take adverse action on its application, but standing alone, it is not a basis for judicial reversal of a MDNS. Impacts documented by the traffic impact study would only be evidence relevant to the need to prepare an environmental impact statement if the impacts were probable, and significant, and environmentally adverse. KLPF and the Whites have shown at most that the DKS studies fell short of what Mr. Tilghman and Mr. Norris believed was required by the County. The County accepted the

studies as sufficient, however, and KLPF and the Whites fail to demonstrate that any alleged shortcomings are the basis for a judicial remedy.

    B.    *Findings Challenged by the Appellants are Supported by Substantial Evidence and Are Not Clearly Erroneous*

KLPF's and the Whites' remaining traffic safety impact challenge is to findings and conclusions in the hearing examiner's SEPA and permitting decisions that they contend are not supported by substantial evidence and are clearly erroneous. Although they assign error to 28 findings of fact made in the SEPA decision, their opening brief includes argument challenging only the hearing examiner's findings that

- the project will be adequately served by existing roads,
- the existing roadway has ample sight lines,
- the County's SEPA review was adequate, and
- there would be no adverse traffic-related impacts.

Opening Br. of Appellants at 58-59.

A finding that "the existing roadway has ample sight lines," as paraphrased in appellants' brief, would not be supported by the evidence; indeed, it would be inconsistent with Ms. Lindblad's and the hearing examiner's own conditions that the entry to the campsite off Oak Ridge Road requires improvement and a traffic engineer must be retained to develop warning signage as needed elsewhere on Oak Ridge Road. Reasonably construed alongside the requirements for improvements and signage, the findings to which the appellants refer (Findings 20.12.9.1 and 21.15) deal with the entry

to the campsite off Oak Ridge Road which, as conditioned, will be improved to provide ample sight lines. *See* CP at 40, 68 ("Oak Ridge is . . . designed with ample site [sic] lines and widths to provide for safe and adequate *access for project traffic*. Approximately 130 feet of the west side . . . would be graded to improve site access. The project would realign the driveway approach . . . to reduce or remove the existing skew. (Emphasis added.)). Understood as referring to the entry off of Oak Ridge Road, as conditioned, the finding is supported by substantial evidence and is not clearly erroneous.

Through their written evidence and the testimony of Mr. White, Mr. Tilghman, and Mr. Norris, KLPF and the Whites presented opinions in conflict with the DKS traffic impact studies and the testimony of Mr. Hunter, Mr. Wright, Dr. Brown, and Ms. Flisakowski. It was within the discretion of the hearing examiner to resolve that conflict in favor of the evidence presented by Under Canvas, which he explicitly states he did, in his findings. We defer to the hearing examiner's assessment of the credibility of witnesses and the weight to be given reasonable but competing inferences. *Friends of Cedar Park Neigh.*, 156 Wn. App. at 641-42. Viewed in a light most favorable to Under Canvas, substantial evidence supports the hearing examiner's challenged findings. A review of the record also confirms the hearing examiner's SEPA appeal and permit decisions were not clearly erroneous as to traffic-related impacts.

61

IV.    DUST AND CATTLE-RELATED IMPACTS

KLPF and the Whites next contend that the hearing examiner's SEPA and permit decisions should be reversed because the Columbia River Gorge project's impacts on dust and cattle were not considered.   They argue that dust is a relevant environmental factor under SEPA, citing WAC 197-11-444(1), "Elements of the environment," as including at (b)(i), "air quality," and at 2(c)(v), "Traffic hazards."  They argue that dust is also relevant to the county's requirement that a property approved for a CUP be found to be "suitable for the proposed use" under KCC 19.53.130, and is relevant to approval of a recreation park permit, since such parks may not be permitted in any area "found unsuitable for such development because of . . . features that may be harmful to the public health . . . and general welfare."  KCC 22.08.110.  They argue that cattle, too, present a "[t]raffic hazard"; that movement of cattle is a transportation-related "movement/circulation of . . . goods" within the meaning of WAC 197-11-444(1)(2c)(iv); and that the continuation of "adjacent natural resource uses" shall be considered and reasonably protected in proceedings pursuant to chapters 19.60 (adjustments, variances and appeals) and 19.62 (amendments and rezones).  KCC 19.02.060.

Because dust and cattle-related impacts were "completely ignored," according to KLPF and the Whites, they contend that the SEPA and permit decisions "are clearly erroneous [and] not supported by substantial evidence."  Opening Br. of Appellants at 62.

A.     *Dust-related Impacts*

Relevant evidence

Under Canvas's amended SEPA checklist states, on the issue of dust:

Direct air quality impacts associated with the operation of the project would primarily result from two sources:

- Exhaust and fugitive road dust emissions from vehicle trips from April to October.
- Exhaust emissions from wood-burning stoves and fire pits from April to October.

AR at 109.  The checklist included calculations of road dust emissions, assuming 247 daily vehicle trips.  Those calculations, which the checklist states were based on United States Environmental Protection Agency emissions factors for Washington State, identified estimated annual emissions of 0.43 ton of particulate matter of a size less than 10 microns and 0.1 ton of particulate matter of a size less than 2.5 microns.  Under Canvas pointed out that all of its emission totals would be less than the 100 tons per year threshold for a project located in a marginal federal nonattainment area, its project would not be located in such an area, and its project "would have no adverse impact with respect to emissions of criteria air pollutants."  AR at 109.  Notice of the MDNS was provided to Klickitat County Environmental Health and the Washington State Department of Ecology.  Both responded with comments, and neither expressed concern about air quality impact.

Local residents, including the Whites, submitted photographs of dust generated by the passage of a single vehicle and multiple vehicles on the gravel portion of Oak Ridge Road. They also submitted declarations that describe the amount of time dust particulate lingers in the air after a vehicle passes. They described dust as an existing problem, expressing concern about increased dust from increased traffic and its impact on their health, on crops, and on property values.

The MDNS contained one condition that addressed dust:

> 39.     Watering or other dust-abatement measures will be used as needed to control fugitive dust generated and minimize wind erosion during construction. A water truck shall be maintained on site during construction.

AR at 168.

Mr. Tilghman's report discussed dust, stating that "one consequence of extra traffic on Oak Ridge Rd. will be the generation of more dust as vehicles travel the gravel portion." AR at 5499. He stated that during the dry months of summer dust can linger "well after a vehicle has passed" and posited that "[w]ith nearly one vehicle per minute, it is likely that a dust cloud will endure the entire hour." *Id.* He later affirmed at the SEPA

hearing that his quantification was based on an experiment conducted by project

opponents on the dust produced by vehicles traveling the road at the rate of a vehicle per

minute.

At the SEPA hearing, Under Canvas's counsel questioned Mr. Hunter about

whether he was concerned about increase in dust from the increased traffic, and Mr.

Hunter responded:

> I have to follow and be consistent for what we've done in the past. Our standards speak to nothing about dust. So, I can't go outside of the standards, or you and I will be talking a different conversation, I'm sure. So, essentially, I don't have anything that speaks to dust. [Department of Ecology] would be the driver of any dust. That's—yeah.

CP at 787-88.

Consistent with the conditions of the MDNS, the hearing examiner's permit

decisions require dust-abatement measures, but only on site and only during construction.

His permit decision further found that dust could be avoided or mitigated as conditioned.

AR at 8852. His SEPA appeal decision does not mention dust.

Law and its application to the facts

Again, KLPF and the Whites argue that because dust-related impacts were

completely ignored, the SEPA decision finding that the County adequately evaluated

impacts and the permit decisions finding that Under Canvas met its burden of proof are

clearly erroneous and not supported by substantial evidence.

As earlier observed, "'[A]n agency does not have to consider every conceivable environmental impact when making its threshold SEPA determination.'" *Wild Fish Conservancy*, 198 Wn.2d at 873 (quoting *PT Air Watchers*, 179 Wn.2d at 932). "SEPA's procedural provisions require the consideration of 'environmental' impacts . . . with attention to impacts that are likely, not merely speculative." WAC 197-11-060(4)(a).

"Environmental impacts are effects upon the elements of the environment listed in WAC 197-11-444." WAC 197-11-752. "'Environment' means, and is limited to, those elements listed in WAC 197-11-444," which does not include "dust." WAC 197-11-740. "'Probable' means likely or reasonably likely to occur, as in a 'reasonable probability of more than a moderate effect on the quality of the environment.'" WAC 197-11-782. "Probable is used to distinguish likely impacts from those that merely have a possibility of occurring, but are remote or speculative." *Id*.

While elements of the environment listed in WAC 197-11-444 do not include dust, they do include "air quality" and "traffic hazards." At issue, then, is whether the record before the hearing examiner included evidence of a probable dust-related impact on *air quality* and *traffic safety* such that his findings that the County "adequately evaluated impacts" and Under Canvas "met its [permitting] burden of proof" are clearly erroneous and not supported by substantial evidence.

Reviewing the record in a light most favorable to Under Canvas and the County, the dust-related information in Under Canvas's amended SEPA checklist and the lack of concern expressed by responding agencies is substantial evidence in support of the decision to not evaluate dust as a probable significant adverse environmental impact— especially as contrasted with the lack of any evidence of prior dust-related accidents and Mr. Tilghman's reliance not on any health or safety standard, but on an experiment conducted by project opponents. The decision to not evaluate dust was also not clearly erroneous because SEPA does not require consideration of every conceivable environmental impact and because, in Washington, a developer cannot be held responsible for correcting a preexisting deficiency. *See Benchmark Land Co. v. City of Battle Ground*, 146 Wn.2d 685, 695, 49 P.3d 860 (2002) (affirming invalidity of condition requiring street improvements that would relieve preexisting street deficiencies but was not directly related to traffic generated by development).

B.    *Cattle-related Impacts*

Relevant evidence

Under Canvas's amended SEPA checklist identified no expected conflict between the proposed project and cattle grazing:

> There is cattle grazing area on and adjacent to the site. The project site is located within an Open Range Grazing area. There is no conflict between the proposed camp use and cattle grazing but fencing is proposed around the footprint of the camp to minimize human interaction with cattle during

67

> the operating season.  Grazing of the full site could still occur in the off
> season as it does today.

AR at 119.

The appellants' prehearing brief to the hearing examiner asserted that cattle

"frequent[ly] use" Oak Ridge Road, however, and "will pose hazards and potential safety

risks for tourists traveling [to] and from the glamping resort."  AR at 5588.  A handful of

comments from nonranching residents raised this traffic concern and/or suggested that

increased vehicle traffic would affect cattle usage of Oak Ridge Road.[13]  Only one

comment identified in the briefing was from members of a ranching family, the Kreps,

who expressed the following concern:

> We have communicated with the proponents, and they understand and will
> fence the area to keep livestock out of their campsite.  One variable that is
> *hard to digest or to predict* will be the increased traffic on Oak Ridge Road
> and collisions with cattle that freely use and cross it.  If the County
> approves U[nder] C[anvas's] conditional use permit, how are they going to
> protect our animals and the out-of-town users of Oak Ridge Rd from
> collisions?  This is open range, and the livestock have the right of way.  If
> one of our animals is hit on the road[,] the person driving the auto is
> responsible for any damages to our livestock.  That is if they report the
> collision, if they take responsibility, and so on.  *We fortunately rarely have
> an animal hit on the road*, but of the ones that have been, under 50% have
> we ever been paid for.  If a significant increase in our livestock being hit on
> the road because of the potential increase in traffic, then we may be forced

---

[13] The appellants cite comments submitted by Bonnie and Dennis White, by Steve Stampfli, by Colleen and Charles Kraus, by Jan Muir, and by Thomas and Marlene Woodward in addition to briefing and correspondence submitted by appellants' counsel. *See* AR 8984, CP at 661 (Whites); AR at 8232-36, 7875 (Stampfli); AR at 8637-38, 12125 (Kraus); AR at 12060 (Muir); and AR at 8093 (Woodward).

> out of this area of our grazing operation, which will dramatically affect our business.

AR at 12128 (emphasis added).

In a post-MDNS comment letter to the SEPA responsible official, KLPF asserted that "traffic from the proposal may interfere with use of Oak Ridge Road for moving cattle within the Gilmer Resource Management Plan . . . Permit Range[, which] . . . envisions large numbers of cattle being moved on area roads to the north and south of the project site throughout the year." AR at 7927. The Kreps' family members had not expressed this concern. A 2001 DNR resource management plan for the Gilmer Permit Range that provides the basis for grazing on state trust land schedules cattle movement for only April and September of each year.

The MDNS does not evaluate cattle. At the SEPA hearing, Ms. Lindblad testified that cattle on the road "[p]ossibly" presented a safety hazard. CP at 747. The hearing examiner's SEPA appeal and permit decisions do not evaluate impacts on, or resulting from, cattle.

As with the issue of dust, at issue is whether the record before the hearing examiner included evidence of a probable significant cattle-related impact on *traffic safety* and the *movement/circulation of goods* such that the hearing examiner's findings that the County "adequately evaluated impacts" and Under Canvas "met its permitting burden of proof" are not supported by substantial evidence and are clearly erroneous.

The record established that the speed limit on most of Oak Ridge Road is 25 m.p.h. While a handful of comments from nonranchers asserted that cattle in the open range area are sometimes on Oak Ridge Road, no evidence was presented of any prior cattle-related accidents on that road. The Kreps family members were the only ranchers who commented, and they stated they "rarely" have an animal hit on the road and that the prospect of collisions is a variable that "is hard to digest or predict." AR at 12128. Ms. Lindblad admitted only that cattle on the road could "possibly" present a traffic safety risk, not that they probably or likely did. Viewed in the light most favorable to the County and Under Canvas, substantial evidence supports the hearing examiner's findings, which are not clearly erroneous.

V.    NO ERROR IS SHOWN IN THE SUPERIOR COURT'S STRIKING OR MODIFICATION OF THREE CONDITIONS OF THE PERMITTING DECISION

Finally, KLPF and the Whites assigned error to the superior court's decisions to strike or modify three conditions imposed by the hearing examiner in approving the CUP and recreation park permits. We address the assignments of error in the order presented.[14]

---

[14] Under Canvas contended in its response brief that KLPF and the Whites failed to perfect their appeal of these assigned errors because they failed to designate the necessary record, including Under Canvas's LUPA petition. KLPF and the Whites thereafter caused the record to be supplemented with the LUPA petition. It was added by the superior court as a supplement to the administrative record and can be found in Volume 19, AR 12662-12703. We note but need not address the now-moot issue.

A.      *Condition 59, Dealing with Compliance Reporting and Retained Jurisdiction*

KLPF and the Whites contend the superior court committed error by striking all, rather than what they contend was only a challenged part, of condition 59 of the permitting decision.  Condition 59 provides:

> 59.    After the first, third, and fifth years of operation, the Applicant shall provide to Klickitat County Planning Department a detailed report with specific facts (and not general conclusory statements) demonstrating how each and every condition of approval is being satisfied.  In the event Klickitat County Planning Department staff, in their sole discretion, believes that the existing conditions should be modified, or deleted, or if new conditions should be added, then this matter shall be returned to the Hearing Examiner for an open record public hearing on issues raised by staff.  Failure to timely submit this report shall result in an immediate suspension of all activities permitted under this permit and the Conditional Use Permit shall be referred to the Hearing Examiner to conduct a hearing and determine what additional actions, sanctions and conditions may apply.

CP at 54.

In its briefing in the superior court, Under Canvas continuously couched its challenge to condition 59 as a challenge to the condition in its entirety, arguing that a local land use decision must be final and not subject to further modification by the local jurisdiction.  *See* CP at 107-11.  It asked the court to strike the condition pursuant to RCW 36.70C.130(1)(e) ("the land use decision is outside the authority . . . of . . . the officer making the decision") on the ground that the condition violated the rule of

71

administrative finality in land use decisions expressed in *Skamania County v. Columbia River Gorge Commission*, 144 Wn.2d 30, 48-49, 26 P.3d 241 (2001).

In response, KLPF and the Whites argued that condition 59 did not violate principles of finality or exceed the hearing examiner's authority.  *See* CP at 388-95.  They argued that "[c]ondition 59 should be upheld."  CP at 395.  They did not distinguish between elements of the condition or argue, in the alternative, that there were reasons for affirming part, if not all, of the condition.

For the first time on appeal, KLPF and the Whites argue that because the gravamen of Under Canvas's challenge to condition 59 was, in their view, to an illegal "reopener" provision, the following language of the condition was not effectively challenged and should be reinstated:

> After the first, third, and fifth years of operation, the Applicant shall provide to Klickitat County Planning Department a detailed report with specific facts (and not general conclusory statements) demonstrating how each and every condition of approval is being satisfied.  Failure to timely submit this report shall result in an immediate suspension of all activities permitted under this permit.

Opening Br. of Appellants at 64-65.

In response, Under Canvas argues that there is no basis in law or fact for reinstating the condition as modified.  It also argues that reinstating the reporting and suspension provisions would "improperly invade the province of the County legislative body which has already, through adopted regulations, established the County's process

72

for permit oversight, including authority to issue penalties, revoke permits, or impose other enforcement remedies, as appropriate." Response Br. of Under Canvas, Inc. at 66.

In reply, KLPF and the Whites argue that Under Canvas is raising a new issue for the first time on appeal, citing RAP 2.5(a). Reply Br. of Appellants at 34. But as the appellants, it is KLPF's and the Whites' burden to demonstrate that the superior court committed reversible legal error on an issue *they* preserved by raising it in the trial court. Where, as here, they raise a new issue, they should not be surprised at facing a new argument in response. "A party may present a ground for *affirming* a trial court decision which was not presented to the trial court if the record has been sufficiently developed to fairly consider the ground." RAP 2.5(a) (emphasis added).

KLPF's and the Whites' challenge to condition 59 fails not only because they raise unpreserved error, but also because their contention that the superior court granted more relief than they believe was asked for does not establish that striking condition 59 in its entirety was reversible legal error.

B.      *Condition 54, Dealing with Amplified Music*

KLPF and the Whites next assign error to the superior court's decision striking condition 54. That condition, which was not requested by the County, provides:

> 54.      No weddings, concerts, or other public or private gathering's amplified music or sounds, shall occur at the facility. If the Applicant wishes to seek authorization for weddings, concerts, or other activities of public and private gatherings, the Applicant shall

> apply to amend this Conditional Use Permit so that all potential impacts of said uses can be identified, studied, and mitigated, if possible. The Hearing Examiner retains jurisdiction to approve, approve with Conditions, or to deny all such proposed additional uses.

CP at 53. Under Canvas challenged this condition as "impermissibly regulat[ing] business conduct instead of legitimate land-use objectives." CP at 116. It expressed concern that the condition appeared to prevent the use of amplified sound at *any* volume level, to prevent the hosting of "'public or private gatherings'" of *any* size or nature, and, by prohibiting weddings of any form, violated protections under the First Amendment to the United States Constitution. *Id.*

The superior court characterized the condition as "ambiguous and unclear," noting that even the County informed the court "it was left 'guessing as to what is and what is not permitted.'" CP at 525. Citing the proposition that a condition that regulates business conditions may be annulled because it is not the function of land use controls, the superior court annulled the condition. CP at 525-26 (citing *Woodinville Water Dist. v. King County*, 105 Wn. App. 897, 906, 21 P.3d 309 (2001)).

Despite assigning error to the superior court's decision to strike the condition, KLPF and the Whites do not argue that striking it was error. Instead, pointing to the superior court's observation that "such a condition would be justified for events

74

exceeding the resort's occupancy levels," they ask us to reinstate the condition with

modifications they propose, as follows:

> No weddings, concerts, or other public or private gathering's amplified
> music or sounds in excess of occupancy levels disclosed in Under Canvas's
> permit application shall occur at the facility.  If the Applicant wishes to
> seek authorization for weddings, concerts, or other activities of public and
> private gatherings such gatherings or events, the Applicant shall apply to
> amend this Conditional Use Permit so that all potential impacts of said uses
> can be identified studied, and mitigated, if possible.  The Hearing Examiner
> retains jurisdiction to approve with Conditions or to deny all such proposed
> additional uses.

*See* Opening Br. of Appellants at 67.  Under Canvas opposes the appellants' modification

request, including because it substantially modifies the condition to address occupancy

rather than noise.

As with condition 59, KLPF's and the Whites' request that condition 54 be

modified is raised for the first time on appeal, and they offer no legal authority or

persuasive argument that we can or should reinstate a condition annulled by the superior

court where they have not demonstrated that striking the condition was legal error.  Like

their challenge to condition 59, this unpreserved and unsupported argument fails.

    C.    *Condition 55, Dealing with On-site Recreational Vehicle Parking*

Finally, KLPF and the Whites assign error to the superior court's modification of

condition 55, which provides:

> 55.    On-site recreational vehicle parking or occupancy on the site is
> prohibited.  The term recreational vehicle includes, but is not limited

> to, trailers, motorhomes, and vehicles with similar living quarter abilities.

CP at 53. The superior court struck the word "parking" from the condition because "preclusion of a class of vehicles, i.e., RV, from parking at the site" does not "fall within a legitimate land use or zoning control issue." CP at 526-27.

KLPF and the Whites argue that as modified by the superior court (striking "parking," but not "parking or"), condition 55 is unclear and ungrammatical. They ask us to revise the superior court's decision by removing the additional word "or." Opening Br. of Appellants at 68. Under Canvas argues that further modification is not necessary because the superior court's decision is clear enough and capable of enforcement.

In *Woodinville Water District*, this court held that "'[t]o be valid, conditions [placed on conditional use permits] must (1) not offend any provision of the zoning ordinance, (2) not require illegal conduct on the part of the permitee, (3) be in the public interest, (4) be reasonably calculated to achieve some legitimate objective of the zoning ordinance, and (5) not be unnecessarily burdensome or onerous to the landowner.'" 105 Wn. App. at 906 (quoting *Gerla v. City of Tacoma*, 12 Wn. App. 883, 889, 533 P.2d 416 (1975)). The superior court's modification of condition 55 is not grammatical, but the condition is not unclear or invalid. We need not disturb it.

VI.   UNDER CANVAS MAY BE ENTITLED TO REASONABLE ATTORNEY FEES AND COSTS
      FOLLOWING REMAND

Under Canvas requests an award of reasonable attorney fees and costs based on

RAP 18.1, RCW 4.84.370(1), *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 413, 120

P.3d 56 (2005), and *Durland*, 175 Wn. App. at 326.  RCW 4.84.370(1) allows awards of

attorney fees on appeal in land use cases to a "prevailing party or substantially prevailing

party" who also prevailed or substantially prevailed before the local government and in

prior judicial proceedings.[15]

KLPF and the Whites respond that RCW 4.84.370(1) entitles a party to an award

of reasonable fees and costs only if it prevails on all issues on appeal, citing *Magnolia*

*Neighborhood Planning Council v. City of Seattle*, 155 Wn. App. 305, 323, 230 P.3d 190

(2010) ("*Magnolia*").  Under Canvas has not prevailed on the issue of the hearing

---

[15] In relevant part, RCW 4.84.370(1) provides:

> Notwithstanding any other provisions of this chapter, reasonable attorneys'
> fees and costs shall be awarded to the prevailing party or substantially
> prevailing party on appeal before the court of appeals . . . of a decision by a
> county. . . to issue, condition, or deny a development permit involving a . . .
> conditional use, . . . or similar land use approval or decision.  The court
> shall award and determine the amount of reasonable attorneys' fees and
> costs under this section if:
>        (a) The prevailing party on appeal was the prevailing or substantially
> prevailing party before the county . . . ; and
>        (b) The prevailing party on appeal was the prevailing party or
> substantially prevailing party in all prior judicial proceedings.

examiner's approval of Under Canvas's conditional use permit without first entering findings required by KCC 19.53.130.

In *Magnolia*, Division One denied Magnolia's request for fees on appeal "because Magnolia is not the prevailing party on all of the issues on appeal," offering no explanation for not addressing whether it had substantially prevailed. 155 Wn. App. at 323. A party does not substantially prevail within the meaning of the statute by prevailing on only procedural issues, but does substantially prevail "when a majority of its substantive issues are decided on the merits." *Witt v. Port of Olympia*, 126 Wn. App. 752, 760, 109 P.3d 489 (2005).

*Magnolia* provides no reason why we should ignore the plain language of RCW 4.84.370(1). Under Canvas has prevailed on appeal except insofar as remand is required for additional findings by the hearing examiner. Because it also prevailed in the superior court and before the hearing examiner, it will be entitled to an award of reasonable attorney fees and costs on appeal unless, on remand, the hearing examiner declines to make findings required for approval of the CUP and his modified decision deprives Under Canvas of its "substantially prevailing party" status.

We reverse the superior court's denial of KLPF's and the Whites' assignment of error to the absence of findings by the hearing examiner on KCC 19.53.130.A.3 and A.4, otherwise affirm the superior court, and remand the matter to the hearing examiner for

No. 38927-8-III
*Klickitat Land Preservation Fund, et al. v. Klickitat County, et al.*

the entry of findings addressing KCC 19.53.130.A.3 and A.4. We retain jurisdiction for the purpose of our commissioners addressing Under Canvas's request for reasonable attorney fees and costs following the hearing examiner's entry of findings.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.P.T.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

79